824 A.2d 1109

TAFAWA BALAGUN, PETITIONER–APPELLANT, v. NEW
JERSEY DEPARTMENT OF CORRECTIONS,
RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted May 13, 2003—Decided June 13, 2003.

Before Judges CUFF, LEFELT and WINKELSTEIN.

Appellant, *Tafawa Balagun,* submitted a pro se brief.

*Peter C. Harvey,* Acting Attorney General, attorney for respondent (*Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Jeffrey K. Gladden,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LEFELT, J.A.D.

Tafawa Balagun, an inmate at South Woods State Prison, appeals from a final decision of the Department of Corrections imposing disciplinary sanctions for possessing materials relating to

a security threat group, the Bloods gang, in violation of *N.J.A.C.* 10A:4–4.1(a). Balagun argues that he is neither a member of any gang nor sympathetic to the Bloods and has been previously sanctioned for possessing some of the same materials. He also points out that the Department has failed to demonstrate how these materials are gang-related, and contends that the materials contain common cultural expressions in support of black nationalism and against racism. We find merit in these arguments and reverse and remand.

A routine search of Balagun's cell revealed numerous letters and pictures which according to several corrections officers related to the United Blood Nation, a group that presents a recognized security threat to the prison. The officers seized the claimed contraband, placed Balagun in prehearing detention, and charged him with violating *N.J.A.C.* 10A:4–4.1(a)(*.011), which prohibits "possession . . . of anything relating to a security threat group."

The seized letters and pictures were reviewed by Senior Investigator Robert Melendez of the Special Investigations Division responsible for disseminating information regarding groups that are security threats. *N.J.A.C.* 10A:5–6.4(a). After reviewing the seized materials, Melendez concluded that the letters and pictures related to the Bloods and then, presumably to assist subsequent reviewers, highlighted Blood signs, references and symbols located throughout the material.

At the discipline hearing, Balagun indicated that he had received most of the documents from his brother and had possession of them for four to five years. Some of the documents he claimed never to have seen before. The hearing officer found Balagun guilty of the charge by relying on the portions of the evidence highlighted by Senior Investigator Melendez. The hearing officer imposed fifteen-days detention with credit for time served, 180 days of administrative segregation, 180 days loss of commutation credits, and disposal of the contraband. The hearing officer reasoned that the sanctions were appropriate because this was Balagun's second offense for possessing gang related materials.

After exhausting his available administrative remedies, Balagun appealed to this court.

The Department argues that because the hearing officer based his decision on substantial evidence in the record, the decision was not arbitrary. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). Because there was substantial evidence supporting the decision, according to the Department, we must affirm even if we disagree with the conclusions that were reached. *In re Vineland Chem. Co.,* 243 *N.J.Super.* 285, 307, 579 *A.*2d 343 (App.Div.), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990).

While these principles are generally correct, in this case the hearing officer has not provided any reasons explaining why he concluded that these materials are gang related and deserving of sanctions. In providing Balagun with a summary of the evidence relied upon, as is required under *Avant v. Clifford,* 67 *N.J.* 496, 522–24, 341 *A.*2d 629 (1975), the hearing officer merely indicated that he relied upon the portions of the documents highlighted by Melendez. While several words in the hearing officer's handwritten summary are totally illegible, this appears to be the only reason provided by the hearing officer to explain the evidence relied upon in reaching his decision. This is unacceptable.

■ We recognize that determining whether prison materials are gang related constitutes a particular Department of Corrections' expertise that is usually exercised by staff members like Melendez. *E.g., New Jersey Dep't of Pub. Advocate v. New Jersey Bd. of Pub. Utils.,* 189 *N.J.Super.* 491, 519, 460 *A.*2d 1057 (App.Div.1983). Normally, when reviewing agency decisions, we defer to matters that lie within the special competence of an administrative tribunal. *E.g., Brady v. Dep't of Pers.,* 149 *N.J.* 244, 256–57, 693 *A.*2d 466 (1997).

■ But, deference does not require that we forego a careful review of administrative decisions simply because an agency has exercised its expertise. We cannot accept without question an agency's conclusory statements, even when they represent an

exercise in agency expertise. The agency is "obliged ... 'to tell us why.' " *In re Valley Hosp.*, 240 *N.J.Super.* 301, 306, 573 *A.*2d 203 (App.Div.1990) (quoting *Drake v. Human Servs. Dep't*, 186 *N.J.Super.* 532, 538, 453 *A.*2d 254 (App.Div.1982)), *certif. denied*, 126 *N.J.* 318, 598 *A.*2d 879 (1991).

■ We have repeatedly stated that while an administrative decision is entitled to deference, we will not perfunctorily review and rubber stamp the agency's decision. *Blackwell v. Dep't of Corr.*, 348 *N.J.Super.* 117, 123, 791 *A.*2d 310 (App.Div.2002)(citing *Williams v. Dep't of Corr.*, 330 *N.J.Super.* 197, 204, 749 *A.*2d 375 (App.Div.2000)). Instead, we insist that the agency disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by this court may be undertaken.

■ The exercise of our review function is especially important in this case. Not only did the hearing officer fail to explain his decision, but the sections of the confiscated materials that Melendez highlighted and were relied upon by the hearing officer were not reproduced in the record. Thus, we could not even locate the specific portions of the documents that Melendez and the hearing officer thought pertinent.

Furthermore, our perusal of these documents leaves us with the impression that there may be some merit to Balagun's claim regarding the benevolent content of the documents. While a few of the letters reference gang activity by Bloods, the context was critical. For example, one handwritten letter dated March 8, 1995 noted that the writer had been a Blood and "banged, slanged, fought." The writer goes on to note that "never during that 9 year [c]ourse did I ever learn what [I am] learning now, the power of Blackness and the destruction that we do to ourselves and how we eliminate our future with the things we do today." In another letter, the writer noted the Bloods were "outta control."

Several of these letters, which appear to be Black Muslim oriented, include statements like "what's up Blood." Balagun

argues that to many in the young urban Black culture, "Blood" can mean a close male friend, a young black man, a dashing man. He submits in support of this construction, pages from the Random House Historical Dictionary of American Slang, 1994 Edition and Webster's Comprehensive International Dictionary, 1995 Edition.

Several letters appear to be harmless communications between friends. In one letter dated March 28, 2000, for example, the writer noted "Get on the ball, don't allow your situation to continue to brake your spirit, Nelson Mandela kept his spirits high while in prison, Rosa Parks stood strong against the bullshit, so what's your excuse?"

The materials also include photos of Tupac Shakur, a black gangsta rapper who was murdered in 1996, which appear to be from popular magazines. Some documents related to the "Million Man March" and others seem to identify with black liberation and sympathize with various expressions such as "Free All Political Prisoners."

■ Given the nature of these materials, some explanation as to which parts or why all are gang related was essential. A prisoner does not lose all constitutional protections upon incarceration. Instead, these protections must be counterbalanced against the goal of accommodating the prison's need for "internal order, discipline, security and rehabilitation." *Matter of Rules Adoption Regarding Inmate Mail to Attorneys, Pub. Officials and News Media Representatives,* 120 *N.J.* 137, 147, 576 *A.*2d 274 (1990).

■ There is another troubling argument raised by Balagun in this appeal. Balagun was found guilty on April 4, 2001 and again on December 10, 2001 of possession of security threat group materials. Balagun claims that after he was previously found guilty of the same offense, the materials were inexplicably returned to him. Some of these returned materials, according to Balagun, were subsequently confiscated and became the basis for the second (December 10) charge, which is the subject of this

appeal. Consequently, according to Balagun the second proceeding was barred by res judicata.

The Department argues that res judicata does not apply because Balagun's possession on December 10, 2001 could not have been determined at the April 4, 2001 hearing. *Brookshire Equities, LLC v. Montaquiza,* 346 *N.J.Super.* 310, 318, 787 *A.*2d 942 (App.Div.) (explaining that to apply res judicata, among other factors there must be an identity of issues and causes of action between the current and prior proceeding), *certif. denied,* 172 *N.J.* 179, 796 *A.*2d 895 (2002).

Moreover, the Department argues that because of the prior determination, Balagun is collaterally estopped from contesting that the materials in this appeal are gang related. *See Monek v. Borough of South River,* 354 *N.J.Super.* 442, 453–54, 808 *A.*2d 114 (App.Div.2002)(contrasting res judicata with collateral estoppel which precludes relitigating a previously determined issue). Thus, the Department claims that because the prison previously determined that some of these materials were gang related, Balagun is estopped from taking a different position in this disciplinary proceeding. Because the hearing officer made no findings regarding the documents, however, we are unable to pinpoint those documents which may have been the focus of both disciplinary proceedings. Nevertheless, by urging the collateral estoppel argument, the Department assumes that at least some of the materials in this appeal could have been the same materials utilized in the previous proceeding.

Moreover, the Department argues that Balagun's res judicata contention is really a disguised double jeopardy argument, which is frivolous because double jeopardy does not apply in the prison discipline context. The Department is correct that we have never treated prison disciplinary proceedings as part of the criminal process and have previously indicated "that the double jeopardy prohibition does not *per se* bar successive prison disciplinary prosecutions for the same infraction." *Russo v. N.J. Dep't of Corr.,* 324 *N.J.Super.* 576, 583, 737 *A.*2d 183 (App.Div.1999).

■ Nevertheless, we have also noted that double jeopardy considerations may have application in some prison discipline situations. *Id.* at 585, 737 *A.*2d 183. Apart from federal and state constitutional protections, we are "duty-bound to insure that administrative proceedings are conducted in accordance with common notions of fundamental fairness." *Ibid.* We have also previously recognized that "there may arise cases in which it would be fundamentally unfair to permit repeated disciplinary prosecutions and sanctions for the same offense or conduct." *Id.* at 585–86, 737 *A.*2d 183. In our view, this is such a case.

While the inmate has no evidence establishing that the prison returned these materials to him after the first hearing, the Department also has presented no evidence that it confiscated and destroyed the allegedly unauthorized materials. In our view, it would be fundamentally unfair to sanction a prisoner twice for possessing the same identical contraband that the prison should have confiscated after the first disciplinary proceeding.

Accordingly, we reverse Balagun's discipline and remand for a new hearing. The hearing officer at the new hearing must determine whether any of the recently confiscated materials had been the subject of the previous hearing. If so, they cannot be utilized on the remand to justify additional sanctions but should remain confiscated. If all or some of these materials are new, then the hearing officer shall determine whether the new materials are gang related. If they are gang related, proper findings and conclusions that can be reviewed by this court must be provided in the summary of evidence relied upon. It is insufficient merely to list by category the evidence that was considered.

Reversed and remanded. We do not retain jurisdiction.