989 A.2d 854 (2010)
412 N.J. Super. 243
Rahgeam JENKINS, Appellant,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS, Respondent.
DOCKET NO. A-1220-08T3.
Superior Court of New Jersey, Appellate Division.
Submitted January 4, 2010.
Decided March 5, 2010.
*856 Rahgeam Jenkins, appellant pro se.
Anne Milgram, Attorney General, attorney for respondent (Lewis A. Scheindlin, Assistant Attorney General, of counsel; John P. Cardwell, Deputy Attorney General, on the brief).
Before Judges AXELRAD, FISHER and ESPINOSA.
The opinion of the court was delivered by
ESPINOSA, J.S.C. (temporarily assigned).
Rahgeam Jenkins, an inmate at New Jersey State Prison, appeals from the final decision of the Department of Corrections (DOC) finding him guilty of disciplinary infraction *.011, which is defined in N.J.A.C. 10A:4-4.1 as "possession or exhibition of anything related to a security threat group." He challenges the regulation as unconstitutionally vague and the sufficiency of the evidence against him. We affirm.
On September 23, 2008, three letters were seized during a search of Jenkins's cell. The investigator reported that Jenkins had occupied the cell where the material was seized since September 27, 2007. He concluded, "I/M is not permitted to possess STG [security threat group] related material, hazard to safety and security of institution[,]" and referred the matter to a hearing officer. Jenkins was placed in pre-hearing detention. The seized letters were referred to the Special Investigations Division (SID)[1] for verification of STG related content. As a result, the hearing was postponed.
Jenkins entered a plea of not guilty and requested a counsel substitute, which was provided.
Three handwritten letters seized from Jenkins's cell were received in evidence at the hearing. Investigator S. Harrison, an Intelligence Investigator who has received training as a gang investigator, prepared an Evidence Review Form. According to Investigator Harrison, two of the letters that Jenkins had received from inmates at other institutions contained STG related *857 material. No references were identified in a third letter.
A letter from an inmate at the Hudson County Correctional Center reads as follows:[2]
Greetings Soldier;
Well i salute all warriors you shed blood sweat & tears with honor and respect. Well as you can see my hearts beating and that im in good hands. Im riding shotgun with Bevinobr so you know we dirty, ya heard. Well i don't know your whole situations and i don't know if i'm a be here long, but you can fly back a kite. As for me, well i just got sentenced by the feds to a 110 months for a gun possession and busting a niggas ass, also i got 2 &starf; and i go by the name of "Trig." If you would send me some street info where i can write and they will send you my mail & vice versa thatll be love. But if its anything more you need from me just holla ill hear it.
 Knotsaka "Trig" aka
 NJ Bravest Heart
P.S. If you have K.O.'s SBI# please forward it to me, so I could bark at him. Trillz Also we had got word that KBs heart might have stop beating, but we're not for sure if hes playing the murda game, but if so hes definitely off of this line & anyone else whose heart stops beating.
[(Emphasis added).]
Investigator Harrison identified the following as references to the Bloods in this letter:
1. The author described the status/rank (2 star General) he holds in the STG Bloods along with his AKA/alias name (Trig).
2. The author uses the term/slang word "Trillz." This is a common word that's used among fellow STG Bloods Members.
The third letter was correspondence between Jenkins and an inmate at South Woods State Prison, which reads as follows:
Komrade
Greetings Brave Heart!
First & formost I will like to extend my love, respect & honor to you. I also hope this vine reaches you in the best of health. Furthermore im assure that your heart is as brave as its ever been! I know you may think its been a mintue since you last heard from me. Although I was at war wit the opposite team. Fortunately the war was win unanimously. I was found not guilty on all counts. So of course the kid is happy! Anyhow that was the situation that cause my delay to respond to you. So have you been up on ya current events. Like how one officer is taken the weight for everything? Or how about the three individuals that got into a shootout with the Feds where as one of the Feds got killed, and the individuals was in the process of robbing the bank? Well as you could tell im getting more intuned to worldly events. Although on the other hand, I would like to refresh your thoughts on a few things. You said I would have to come there in order to receive something of such substance. Anyhow im in need of some info. I would like to know if you could look into things or maybe you may have it yourself. I need for you to try to provide me with. The info on where in S.I. unless you have the info already. The info to get in touch wit KO. Im asking cause someone wit your prestige maybe able *858 to provide me with that. Now as far as the vine you received without the stamp. The box where I was being held allows you to send three free letters a week. So thats what that be about. Other than that trust and believe I am my brothers keeper! Without further delay Im resting my pen. Stay Strong stay Brave! [obscured  illegible][3] bury stillmatic.
 Truly Brave
 014
 Bevin30
PS
Ford is built tough!
Im just Hard Body! How about you?
[(Emphasis added).]
Investigator Harrison identified the following STG reference in this letter:
The author uses the Greeting "Brave Heart." This is common greeting among the STG Bloods (Valentine Blood set).
At the disciplinary hearing, Jenkins provided a statement, i.e., "I was just communicating. I feel that I did nothing wrong." His counsel substitute also provided a statement:
The population was never provided with any advance notice as to what constitutes a STG phrase, etc. How can guys be charged without knowing what a gang term is? There is nothing in handbook or memo from administrator.
Jenkins declined the opportunity to call witnesses or to confront or cross-examine adverse witnesses. Jenkins and his counsel substitute were afforded the opportunity to review the adjudication report and all evidence used by the hearing officer.
The hearing officer found Jenkins guilty of *.011, possessing or exhibiting anything related to a security threat group. Jenkins received a sanction of 15 days detention, 180 days administrative segregation and 180 days loss of commutation time. The reasons stated for the sanction were:
To deter any STG related activities. The DOC has zero tolerance policy involving STG matters.
Jenkins filed an administrative appeal. The Assistant Superintendent, New Jersey State Prison, upheld the decision of the hearing officer. In this appeal, Jenkins raises the following issues:
POINT I
THERE IS INSUFFICIENT EVIDENCE IN THE RECORD TO SUSTAIN A FINDING OF GUILT.
POINT II
APPELLANT WAS NOT GIVEN PROPER NOTIFICATION OF THE RULES ALLEGED TO HAVE BEEN VIOLATED.
The thrust of Jenkins's appeal is that, without notice of the "specifically prohibited words or images relating to STG groups," the regulation is unconstitutionally vague because it fails to provide adequate notice to those individuals who are subject to it. See State v. Cameron, 100 N.J. 586, 591, 498 A.2d 1217 (1985). To prevail on a facial vagueness challenge, the law must be shown to be impermissibly vague in all its applications. Id. at 594, 498 A.2d 1217. When, however, the law is challenged as applied, it must be proven that the law is unclear in the context of the particular case. Ibid. Therefore, to succeed here, Jenkins must show that *.011 is impermissibly vague in all its applications *859 or, that the law is too vague to provide fair warning that his conduct was prohibited. See Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584, 590 (1972). Factors to be considered in determining the required degree of clarity include the purpose of the regulation; the context in which it is challenged; the conduct that is prohibited; the nature of the punishment involved; and the potential impact of the regulation upon constitutionally protected activities. See Cameron, supra, 100 N.J. at 594, 498 A.2d 1217.[4] After careful consideration, we conclude that disciplinary infraction *.011, as defined in N.J.A.C. 10A:4-4.1, is neither facially vague nor unconstitutionally vague as applied. U.S. Const. amend. V; N.J. Const. art. I, ¶ 1.

I
A law is facially vague if "there is no conduct that it proscribes with sufficient certainty." Cameron, supra, 100 N.J. at 593, 498 A.2d 1217. To succeed on a facial challenge of vagueness, "`the complainant must demonstrate that the law is impermissibly vague in all applications.'" Binkowski v. State, 322 N.J.Super. 359, 380-81, 731 A.2d 64 (App.Div.1999) (quoting Village of Hoffman Estates v. Flipside Hoffman Estates Inc., 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 371 (1982)). A statute will not be found defectively vague merely because there is some "difficulty in determining whether certain marginal offenses fall within [its] language." State v. Emmons, 397 N.J.Super. 112, 124, 936 A.2d 459 (App.Div.2007), certif. denied, 195 N.J. 421, 949 A.2d 849 (2008).
Notice of conduct that is prohibited is a basic component of due process and fundamental fairness in prison disciplinary proceedings. See Avant v. Clifford, 67 N.J. 496, 513, 341 A.2d 629, (1975). However, the fact that this issue is addressed within the context of a prison disciplinary hearing has significant bearing on "the level of judicial scrutiny and degree of required clarity." See Cameron, supra, 100 N.J. at 594, 498 A.2d 1217. Even in criminal cases, context matters. The "linguistic analysis" is conducted in "the reality in which the [statutory] provision is to be applied." State v. Warriner, 322 N.J.Super. 401, 408, 731 A.2d 86 (App.Div.1999); State v. Saunders, 302 N.J.Super. 509, 520-21, 695 A.2d 722 (App. Div.), certif. denied, 151 N.J. 470, 700 A.2d 881 (1997). Therefore, in analyzing the clarity of the regulation, it is expected that a person of ordinary intelligence who is affected by the standard will use common sense and be guided by principles applicable to the context. See San Filippo v. Bongiovanni, 961 F.2d 1125, 1139 (3d Cir.), cert. denied, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992) (evaluating a vagueness challenge to a standard for discharge from public employment).
The notice of prohibited conduct required before discipline may be imposed must be measured with due regard for the prison's legitimate needs and objectives. The Supreme Court has observed,

*860 [T]he fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.
[Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951 (1974) (citations omitted).]
Accordingly, prisoners' rights "are abridged to the extent necessary to accommodate the institutional needs and objectives of prisons." McDonald v. Pinchak, 139 N.J. 188, 194, 652 A.2d 700 (1995).
The institutional need to control the inmate population and maintain order is manifest. In McDonald, supra, our Supreme Court observed:
[T]he daily interaction between inmates and prison officials can create a tense environment that requires special measures to ensure safety. Swift and certain punishment is one tool prison officials use to maintain order and discourage future misconduct by a perpetrator.
[139 N.J. at 194, 652 A.2d 700.]
See also Bowden v. Bayside State Prison, 268 N.J.Super. 301, 305-06, 633 A.2d 577 (App.Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994) ("The need for proper control over the conduct of inmates in a correctional facility . . . cannot be doubted.").
Above and beyond the generalized need to maintain order, both the courts and penal institutions have recognized the specific threat to prison security posed by gang activity. The Supreme Court described this threat in unvarnished terms:
Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest. Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls.
[Wilkinson v. Austin, 545 U.S. 209, 227, 125 S.Ct. 2384, 2396, 162 L.Ed.2d 174, 192-193 (2005).]
In 1998, the Department of Corrections responded to escalating gang violence in New Jersey's prisons in a "Policy Statement for the Management of Security Threat Group Members" (STG Policy). See Fraise v. Terhune, 283 F.3d 506, 509 (3d Cir.2002); Blyther v. N.J. Dep't of Corr., 322 N.J.Super. 56, 59-60, 730 A.2d 396 (App.Div.), certif. denied, 162 N.J. 196, 743 A.2d 848 (1999). The regulation challenged here was issued in 1998, 30 N.J.R. 2619A, along with other regulations related to the STG Policy. The legitimacy of the State's interest in addressing gang activity is conceded by Jenkins, who acknowledges that "a prison rule forbidding STG related material is legitimate and security related."
The level of scrutiny required here is also affected by the recognized need to allow prison officials flexibility.
Prisons are dangerous places. The courts must afford appropriate deference and flexibility to State officials trying to manage a volatile environment. Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life.
[Blyther, supra, 322 N.J.Super. at 65, 730 A.2d 396 (citations omitted).]
*861 The exercise of deference and flexibility does not encroach upon appropriate judicial review. Even in reviewing prison disciplinary actions that concern STG activity, "we will not perfunctorily review and rubber stamp the agency's decision," but will require the agency to "disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by this court may be undertaken." Balagun v. N.J. Dep't of Corr., 361 N.J.Super. 199, 202-03, 824 A.2d 1109 (App.Div.2003). See also Greybuffalo v. Kingston, 581 F.Supp.2d 1034, 1042 (W.D.Wis.2007) ("Although courts are required to defer to the reasoned judgment of prison officials on gang-related matters, prison officials cannot avoid scrutiny for restricting prisoners' constitutional rights simply by incanting the word `gang.'") (citation omitted).
The nature of the punishment entailed, see Cameron, supra, 100 N.J. at 594, 498 A.2d 1217, is the imposition of sanctions within the prison disciplinary scheme. In Pazden v. N.J. State Parole Bd., 374 N.J.Super. 356, 370, 864 A.2d 1136 (App.Div.2005), we found it appropriate to apply the strictest level of scrutiny to the special conditions of parole imposed upon an inmate after his release because the potential consequence to the parolee of violating the condition is similar to that in a criminal prosecution, "the very real threat of incarceration." Where the liberty interest at stake is less than the complete loss of one's freedom, the process due will be correspondingly less. See Jamgochian v. N.J. State Parole Board, 196 N.J. 222, 240, 952 A.2d 1060 (2008). In evaluating the process due to a community-supervised-for-life offender prior to the imposition of a curfew, the Court observed the "difference between re-incarceration in State Prisonthe complete loss of one's freedom" and a curfew. The court noted further that the offender was not necessarily entitled to the procedural protections required at a parole or probation revocation hearing. Ibid.
A disciplinary infraction based upon prohibited act *.011 does not expose an inmate to either a complete loss of freedom or a curtailment of his liberty beyond the schedule of sanctions for asterisk offenses set forth in N.J.A.C. 10A:4-5.1(a).[5] Therefore, the potential punishment for this infraction warrants no heightened degree of scrutiny.
N.J.A.C. 10A:4-4.1 defines *011 as "possession or exhibition of anything related to a security threat group[.]" Terms relevant to an understanding of this infraction are defined in N.J.A.C. 10A:5-1.3. "Security threat group" is defined as
a group of inmates possessing common characteristics, interests and goals which serve to distinguish the group or group members from other inmate groups or other inmates and which, as a discrete entity, poses a threat to the safety of the staff, other inmates, the community, or causes damage to or destruction of property, or interrupts the *862 safe, secure and orderly operation of the correctional facility(ies).
N.J.A.C. 10A:5-1.3 defines "Security threat group activity(ies)" as "activity(ies) or action(s) of an inmate that relate either directly or indirectly to the goals of a security threat group." The prohibited activities include, but are not limited to:
1. Possession of security threat group literature, such as, correspondence, newsletters, publications, lessons, membership lists, and manuals....
[N.J.A.C. 10A:5-1.3 (emphasis added).]
Therefore, at a minimum, the regulation provided notice that the possession of "security threat group literature" is prohibited; that such "literature" includes correspondence and that, if the contents of the letter "relate either directly or indirectly to the goals of a security threat group," it will fall within the prohibition.
We reject the argument that due process requires the DOC to specifically identify prohibited words or images relating to security threat groups. A list of prohibited terms and symbols would be easily sidestepped by inmates motivated to do so and would subvert the prison's legitimate objective to curtail STG activity. See Koutnik v. Brown, 456 F.3d 777, 785 (7th Cir.2006), cert. denied, 552 U.S. 809, 128 S.Ct. 39, 169 L.Ed.2d 10 (2007) ("[G]ang symbolism is not static; symbols change and are added as gangs expand their bases and combine with other groups."). In rejecting an inmate's vagueness challenge to a rule prohibiting gang conduct, the Supreme Court of Iowa recognized that requiring "ultraspecificity" in defining what constituted prohibited gang activity would encroach upon the flexibility needed by prison officials in administering their institutions. James v. State, 541 N.W.2d 864, 872 (Iowa 1995). The court summarized the notice required,
[The inmate] is not entitled to know every conceivable way his actions could violate rule 42. He is entitled to know what general categories of behavior will subject him to the rule.
[Ibid.]
The court concluded that the Iowa rule "provides inmates adequate notice that involvement in gang activity will not be tolerated. It informs inmates of what categories of behavior will subject them to the rule." Like the Iowa Supreme Court, we conclude that this regulation survives the facial vagueness challenge because it provides inmates with adequate notice that involvement in STG activity will not be tolerated and identifies general categories of behavior that will subject them to disciplinary action.

II
We next turn to consider whether the regulation is unconstitutionally vague as applied.
A statute is unconstitutionally vague as applied if it "does not with sufficient clarity prohibit the conduct against which it [is] sought to be enforced." Cameron, supra, 100 N.J. at 593, 498 A.2d 1217; Moran, supra, 408 N.J.Super. at 429, 975 A.2d 480. The purpose of the doctrine is only to give "fair warning" of prohibited conduct. Colten, supra, 407 U.S. at 110, 92 S.Ct. at 1957, 32 L.Ed.2d at 590. Because the party claiming that a law is vague as applied may only challenge the law as applied to his or her own conduct, State v. Walker, 385 N.J.Super. 388, 403, 897 A.2d 411 (App.Div.), certif. denied, 187 N.J. 83, 899 A.2d 305 (2006), it is only necessary to give the party "fair warning" that his or her conduct is prohibited. Such warning is provided when "a person of ordinary intelligence may reasonably determine what conduct is prohibited so that he or she may act in conformity with *863 the law." Saunders, supra, 302 N.J.Super. at 520-21, 695 A.2d 722. As previously noted, in determining whether fair warning was provided, it is expected that the affected person is of ordinary intelligence, will use common sense and be guided by principles applicable to the context. See San Filippo, supra, 961 F.2d at 1139; Warriner, supra, 322 N.J.Super. at 408, 731 A.2d 86; Saunders, supra, 302 N.J.Super. at 520-21, 695 A.2d 722.
Jenkins described the seized letters as "mail from a past associate." The letters were supplied to the hearing officer and made a part of the record for our review. The report of the gang investigator identified specific references as STG related terms and provided some, albeit limited, explanation for his conclusions. Moreover, although some of the words identified by the investigator may seem innocent out of context, our review of the language within the context of the letters supports the investigator's conclusion.[6]
The investigator identified the term "Brave Heart" as a common greeting among the STG Bloods. The two letters are replete with references to brave hearts. For example, in the letter signed by Bevin30, the writer begins with the salutation noted by the investigator and then says he is sure "your heart is as brave as its [sic] ever been;" he urges the recipient to "Stay Strong stay Brave;" and signs off as "Truly Brave." Similarly, the letter signed by "Trig" states, "as you can see my hearts beating" and closes by calling the writer "NJ Bravest Heart." In a postscript, Trig speaks of receiving information that "KBs heart might have stop beating," that while "we're not sure if hes playing the murda game, but if so hes definitely off of this line & anyone else whose heart stops beating." It is reasonable to infer from the context for these references that these terms refer to status and continuing membership and that, in describing the termination of communication with anyone "whose heart stops beating[,]" the postscript refers to persons who cease being loyal to the group.
In addition, the letters reflect a shared attitude that criminal activity and facing prosecution are perceived as war in which the correspondents are embattled and can attain status within the group. E.g.,
"I was at war wit[h] the opposite team. Fortunately the war was win unanimously. I was found not guilty on all counts."
"[I] salute all warriors you shed blood sweat & tears with honor and respect."
"[I] just got sentenced by the feds to a 110 months ... also I got 2 * and go by the name of `Trig.'"
This last comment was specifically addressed by the investigator, who said that it described the status of two star general the writer achieved in the Bloods. The context of this comment supports an additional inference that a nexus exists between the writer's federal conviction and getting two stars. Therefore, the investigator's conclusion appears well founded.
*864 In addition, in his letter "Trig" asks for "some street info where [I] can write and they will send you my mail & vice versa[.]" Since both "Trig" and Jenkins are incarcerated, their correspondence is subject to N.J.A.C. 10A:18-2.5(a), which provides that all correspondence to or from other inmates may be read by prison staff. It is evident that this request for an alternative address is related to an intent to circumvent that regulation and the possible review of communications by prison officials.
Given the common thread of language identified by the investigator as part of the Bloods vernacular and the expressed interest in evading prison regulations, these letters are fairly considered to "relate either directly or indirectly to the goals of a security threat group," that is, "a group of inmates possessing common characteristics, interests and goals" that poses a threat to the interruption of "the safe, secure and orderly operation of the correctional facility[ ]." N.J.A.C. 10A:5-1.3. Therefore, we conclude that the regulation provided Jenkins with fair notice that possession of these letters was prohibited.

III
After careful review of the record, we are satisfied that the challenge to the sufficiency of the evidence lacks merit and does not warrant discussion in a written opinion beyond the following brief comments. R. 2:11-3(e)(1)(D). We review decisions on prison discipline to determine whether the findings are supported by the record and give deference to the agency's interpretation of its regulations. Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 56, 766 A.2d 312 (App.Div.2001); Williams v. Dep't of Corr., 330 N.J.Super. 197, 203-04, 749 A.2d 375 (App.Div.2000). We defer to an agency decision and do not reverse unless it is arbitrary, capricious or unreasonable or not supported by substantial credible evidence in the record. Bailey v. Bd. of Review, 339 N.J.Super. 29, 33, 770 A.2d 1216 (App.Div.2001).
We are satisfied that the evidence relied upon by the hearing officer and the associate administrator provided the required "substantial" evidence to support the disciplinary violation against Jenkins. See McDonald, supra, 139 N.J. at 195, 652 A.2d 700; N.J.A.C. 10A:4-9.15(a). We are further satisfied that the disciplinary proceedings were conducted in accordance with all applicable due process requirements. See Avant, supra, 67 N.J. at 522, 341 A.2d 629. It follows that the disciplinary decision was not arbitrary, capricious, or unreasonable and should not be disturbed. Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980).
Affirmed.
NOTES
[1] The responsibilities of the Intelligence Section of the Special Investigations Division identified in N.J.A.C. 10A:5-6.4 include "the gathering, accumulation, control, maintenance and dissemination of information regarding designated and alleged security threat group(s), identified and alleged group members and identified and alleged core group members."
[2] The quoted letters are presented as written to avoid any misinterpretation. Emphasis is supplied to the STG related references identified by the Intelligence Investigator.
[3] The words are partially obscured by a series of letters, including Greek letters, and symbols of indeterminate origin.
[4] In addressing these factors here, Jenkins has not alleged that the disciplinary regulation has any impact on the exercise of any constitutionally protected rights such as rights to associate or express himself. We note that the regulation merely forbids him from "possess[ing] documents that refer to an unauthorized organization," Allah v. Dep't of Corr., 326 N.J.Super. 543, 549, 742 A.2d 162 (App.Div.1999) (quoting Leitzsey v. Coombe, 998 F.Supp. 282, 287 (W.D.N.Y.1998)), and does not preclude association or expression otherwise. Therefore, we focus on the context, the purpose of the regulation and the prohibited conduct, factors that are closely related here.
[5] While an adjudication may be used, but is not required, for identification of an inmate as a core STG member and transfer to the Security Threat Group Management Unit [STGMU], see N.J.A.C. 10A:5-6.9, that potential does not require enhanced scrutiny. Recognizing that "the STGMU program is a nonpunitive unit assignment designed to anticipate and prevent potential threats to ordinary prison operation," we have held that assignment to that unit "does not require the protection of the full panoply of rights attendant to criminal trials or even those rights attendant to disciplinary hearings." Blyther, supra, 322 N.J.Super. at 67, 730 A.2d 396. See also Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418, 430 (1995); Szemple v. Dep't of Corr., 384 N.J.Super. 245, 249-250, 894 A.2d 698 (App.Div. 2006).
[6] This case is therefore factually distinguishable from Balagun, supra, where the record did not permit such judicial review. The investigator merely highlighted the relevant portions without any explanation; the hearing officer failed to explain his decision; the highlighted portions were not reproduced in the record and this court was unable to discern what portions of the seized documents the investigator and hearing officer thought pertinent. Moreover, our review of the documents in Balagun supported the inmate's claim that their content was benevolent. 361 N.J.Super. at 203, 824 A.2d 1109. There was also the "troubling" claim made by the inmateand not refuted by DOCthat the inmate had previously been found guilty of the same offense based upon the same documents and that the materials were "inexplicably" returned to him thereafter.