# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0398-22

D.G.-M.,[1]

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

     Submitted October 7, 2024 – Decided October 30, 2024

     Before Judges Sabatino, Berdote Byrne, and Jacobs.

     On appeal from the New Jersey Department of Corrections.

     D.G.-M., appellant pro se.

     Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Nicholas Falcone and Patrick J. Misale, Deputy Attorneys General, on the brief).

---

[1] We use initials and a fictitious name to protect appellant's privacy interests. R. 1:38-11(b).

PER CURIAM

Appellant, "Dory," who identifies as female, appeals from a final decision of the Department of Corrections ("DOC") upholding the Prison Rape Elimination Act ("PREA") Accommodation Committee's ("PAC") July 27, 2022 determination to transfer Dory out of a women's correctional facility and place her in what is known as the "vulnerable housing unit" at a men's facility. On appeal, Dory argues the DOC's decision should be reversed because it was arbitrary and capricious, and because the record did not contain substantial evidence to support the DOC's findings. Dory also contends the PAC is unqualified to make housing decisions for transgender inmates, and the DOC's decision is discriminatory towards her as a transgender woman, and in retaliation for her past grievances and complaints.

We conclude the PAC's decision to transfer Dory from a women's correctional facility and its decision to house her in the vulnerable housing unit at a men's correctional facility were both justified and in compliance with all DOC regulations. Accordingly, we find the DOC's decision is not arbitrary, capricious, or unreasonable and affirm.

A-0398-22

## I.

Dory is an incarcerated transgender person who currently identifies as female. She was initially housed in a men's correctional facility in 2011 but was transferred to Edna Mahan Correctional Facility ("EMCF"), a woman's correctional facility, in August 2020 after she informed the DOC she identified as a transgender woman and wished to be housed consistent with her gender identity. However, in February 2022, Dory requested to be transferred back to a men's correctional facility. She reiterated this request on April 20, 2022, out of fear she would be transferred to a facility outside of New Jersey. On May 4, 2022, the PAC decided not to vote on Dory's request to be transferred because of her "own expressed views concerning her safety and repeated references to rescinding her application." Dory rescinded her transfer request on May 5, 2022.

In April 2022, EMCF officials investigated two alleged "[i]nmate on [i]nmate consensual sexual relationship[s]" with "[c]onfirmed pregnanc[ies]" involving Dory. Following the investigation, EMCF issued disciplinary charges

3

against Dory for "[e]ngaging in sexual acts with others" in violation of N.J.A.C. 10A:4-4.1(a)(2)(v) (prohibited act *.051).[2]

On June 3, 2022, the PAC initiated a review of Dory's housing assignment because her placement at EMCF not only threatened her own safety, but "threaten[ed] orderly operation, management[,] and security of the correctional facility and pose[d] a risk to other incarcerated people in the facility." On June 24, 2022, the PAC held a meeting, without Dory present, and decided it could no longer "house [her] in[-]line with gender identity (female facility) based on the safety of inmate [Dory]." Following this decision, Dory was transferred to the vulnerable housing unit at Garden State Youth Correctional Facility ("GSYCF"), a men's correctional facility. Dory appealed the decision to the DOC.

On July 21, 2022, the DOC remanded the PAC's decision to transfer Dory to GSYCF for the development of a more complete record. On July 27, 2022, the PAC held a hearing, at which Dory was present, and considered: her past safety concerns while housed at EMCF; the "four formal [k]eep [s]eparate orders

---

[2] Although Dory admitted to impregnating both inmates at EMCF in previous messages and communications with the PAC, she "reserve[d] comment" in her letter appealing the July 27, 2022 decision, writing "no one even knows . . . if I impregnated both women, instead my statements [and] [i]nvestigations rendered a conclusion that is [n]ot supported by facts[,] i.e. DNA test [sic]."

A-0398-22

[against her] . . . as a result of her involvement in various conflicts with other [incarcerated people] and impregnating multiple women at EMCF"; the inability to move her to her former housing unit at EMCF because she was allegedly "sexually assaulted by an unknown individual also housed in the unit"; and the six out-of-state placement requests made by the DOC, all of which were declined. At the hearing, the PAC considered Dory's medical and mental health, and her access to gender-affirming hormone therapy as an incarcerated person at GSYCF.

Dory administratively appealed the July 27, 2022 PAC housing decision, but the DOC upheld the PAC's decision finding "sufficient information to support the decision to continue to house [Dory] in[-]line with her assigned sex at this time." The DOC added Dory's placement at GSYCF will be "periodically reviewed," as required by the DOC's Transgender, Intersex, and Non-Binary Inmates Policy ("DOC Policy"). Following the DOC's final decision and another transfer request from Dory to be placed at Northern State Prison, a different men's correctional facility, she was transferred out of GSYCF on approximately September 22, 2023. This appeal followed.

II.

Our role in reviewing a final decision of the DOC is limited.  Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 190 (App. Div. 2010).  The decision will not be disturbed on appeal unless it was "arbitrary, capricious[,] or unreasonable or it [was] not supported by substantial credible evidence in the record as a whole."  Mejia v. N.J. Dep't of Corr., 446 N.J. Super. 369, 376 (App. Div. 2016) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).  Indeed, "[w]ide discretion is afforded to administrative decisions because of an agency's specialized knowledge."  In re Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020).  However, the agency must "disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by this court may be undertaken."  Malacow v. N.J. Dep't of Corr., 457 N.J. Super. 87, 93 (App. Div. 2018) (quoting Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 203 (App. Div. 2003)).

To determine whether an agency's action is arbitrary, capricious, or unreasonable, we examine three factors.  Blanchard v. N.J. Dep't of Corr., 461 N.J. Super. 231, 238 (App. Div. 2019).  First, we look at whether "the agency follow[ed] the law."  Ibid. (quoting In re Carter, 191 N.J. 474, 482 (2007)).  Second, we examine "whether the record contains substantial evidence to

6

support the findings on which the agency based its action." Ibid. Third, we examine "whether[,] in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." Ibid.

With respect to the first factor, the DOC has "complete discretion in determining an inmate's place of confinement." Smith v. N.J. Dep't of Corr., 346 N.J. Super. 24, 29 (App. Div. 2001) (citing N.J.S.A. 30:4-91.2). Although the DOC has discretion over the housing of inmates, it is bound by the DOC Policy that "establish[es] procedures regarding the health, safety, and dignity of incarcerated persons, including transgender, intersex, and non-binary incarcerated persons, in the custody of the NJDOC, including ensuring the rebuttable presumption to live in line with their gender identity." See N.J. Dept. of Corr., DOC Internal Management Procedure PCS.001.TGI.01 § I (rev. Oct. 11, 2022) [hereinafter DOC Procedure]. The DOC Policy is comprised PREA, 34 U.S.C. §§ 30301-09, associated federal regulations, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to 10:5-49.

The PREA protects inmates from prison rape. 34 U.S.C. § 30302. Its purposes include "establish[ing] a zero-tolerance standard for the incidence of prison rape in prisons in the United States"; "increas[ing] the accountability of

prison officials who fail to detect, prevent, reduce, and punish prison rape"; and "protect[ing] the Eighth Amendment rights of [f]ederal, [s]tate, and local prisoners." Ibid. Consistent with the PREA, DOC Policy states:

> Once the NJDOC learns and confirms an incarcerated person's gender identity . . . it shall determine the incarcerated person's facility and housing unit assignment, with a rebuttable presumption that the incarcerated person will be housed in[-]line with their gender identity. The [PAC] may deviate from the presumptive placement following a thorough individualized review . . . .
>
> [DOC Procedure § III].

The DOC Policy complies with the PREA by ensuring transgender inmates are assigned housing on "a case-by-case basis, [considering] whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c).

The PAC's decision to transfer Dory out of EMCF applied the PREA, DOC Policy, and DOC Procedure, basing its decision on "whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c). When the June 24, 2022 PAC decision did not provide a detailed-enough explanation of how Dory was unsafe, and how her placement at EMCF impacted the management or security of the facility, the DOC remanded the matter to the PAC

8

for a hearing, specifically requesting more detail regarding why Dory could no longer be safely housed at EMCF. The July 27, 2022 PAC decision was an individualized determination of Dory's housing and specifically stated the PAC's concerns regarding Dory's safety at EMCF[3] and the management and safety concerns caused by her placement at EMCF.[4]

Although the PAC "deviate[d] from the presumptive placement" of housing Dory at EMCF, this decision was made "after an individualized determination and upon written certification that the placement would jeopardize the inmate's health and safety." In its final decision, the DOC "carefully review[ed] and consider[ed]" Dory's narrative and medical records submitted on appeal and upheld the PAC's decision because there was "sufficient information to support the decision to continue to house her in[-]line with her

---

[3] Dory expressed she felt unsafe at EMCF due to "sexually inappropriate comments" another inmate allegedly made to her; alleged sexual harassment by another inmate; "fe[eling] pressured into having sex [and] . . . be[ing] grabbed" by other inmates and EMCF "upper level management . . . not car[ing]"; as well as additional concerns such as "feel[ing] like the [EMCF] administration is trying to make [her] get raped [sic]."

[4] The PAC considered the four keep-separate orders against Dory; the inability to house her in her previous housing unit because of the alleged sexual assault by an unknown inmate also housed in that unit; and the inability to house Dory in EMCF's general population because she "was housed in a [general population] non-dormitory setting prior to April[] 2022, when the first pregnancy was identified."

A-0398-22

assigned sex at this time." Both the July 27, 2022 PAC decision and the August 25, 2022 DOC final decision provided substantial evidence of Dory expressing safety concerns regarding her housing at EMCF, as well as causing management and security concerns at EMCF. According to the PAC, Dory had the highest number of orders to be kept separate from other inmates at EMCF, including two for violating N.J.A.C. 10A:4-4.1(a)(2)(v) (prohibited act *.051), engaging in sexual activity with others, which resulted in two EMCF inmates becoming impregnated.

Pursuant to the DOC Policy, the PAC considered these facts when determining "whether the particular placement would present management or security problems . . . . [and] [t]his consideration [was] applied equally to all inmates, regardless of their sex or gender identity, and . . . justif[ied] a deviation from an inmate's presumptive placement in[-]line with gender identity." The PAC further relied upon the fact "[Dory] could not explain to [the PAC's] satisfaction why she now 'ha[d] no safety concerns' about housing at EMCF after several years of [alleging] documented health and safety concerns." The PAC also pointed to the "[m]ultiple women at EMCF [who] . . . expressed fear and anger towards [Dory]" due to her having impregnated two inmates at EMCF and

10

emphasized Dory's keep-separate orders and guilty findings in making its determination.

Considering these facts in their totality, the PAC's decision to transfer Dory out of EMCF was reasonable and based on her safety concerns at EMCF as well as the correctional facility's security concerns following her recorded violations and keep-separate orders. The PAC followed the DOC's internal procedures and the PREA in first searching for out-of-state placements to continue housing Dory in-line with her gender identity, and then transferring her to the vulnerable housing unit at GSYCF. The DOC's decision to uphold the PAC's housing determination was not arbitrary, capricious, or unreasonable and Dory's safety concerns at the GSYCF vulnerable housing unit are belied by her subsequent, voluntary transfer request to Northern State Prison.

Dory's claim that the DOC violated her constitutional rights, not raised before the DOC but which we choose to address in our discretion, is also unavailing. The Eighth Amendment protects against cruel and unusual punishments and imposes a duty to ensure humane conditions in prisons. U.S. Const., amend. VIII; Farmer v. Brennan, 511 U.S. 825, 847 (1994) (holding "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a

11

substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").

The United States Supreme Court has stated "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988)). This protection from violence includes preventing sexual assaults. See id. at 833-34 ("Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another" does not legitimately serve a prison's penological objective) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

Prison officials violate their duty to take reasonable steps to protect an inmate's safety and prevent harm when (1) the inmate "is incarcerated under conditions posing a substantial risk of serious harm" and (2) the officials have a "state of mind . . . of 'deliberate indifference' to inmate health or safety." Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 302-03 (1991)).

A correctional facility's decision to house a transgender inmate who identifies as female in a men's facility does not automatically violate the duty to prevent harm. See Richardson v. District of Columbia, 322 F. Supp. 3d 175, 184 (D.D.C. 2018) (finding although "Farmer put correctional officers on notice

12

that they cannot house together a transgender female inmate who they know faces a particularly high risk of assault with a male inmate," the United States Supreme Court did not "hold that transgender female inmates, notwithstanding their own housing preferences, may never be celled with male inmates") (emphasis omitted).

The PAC's decision to house Dory in the vulnerable housing unit at GSYCF was constitutional in light of the circumstances because it took reasonable steps to prevent her from harm. Aware of Dory's gender identity, the PAC housed Dory in a unit specifically designated for vulnerable inmates. As an inmate in the vulnerable housing unit, the PAC provided Dory with "gender affirming products and other gender-related accommodations"; "[s]ingle [c]ell [h]ousing"; "[s]ingle [s]hower [c]apability"; and additional services. The PAC decided to house Dory in the vulnerable housing unit at GSYCF to keep her safe. There is no evidence in the record of the PAC's "deliberate indifference" for Dory's health or safety. See Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 302-03). And Dory is not precluded from requesting future transfers based on new circumstances if she feels her current placement at a men's correctional facility is not suitable. In fact, the DOC agreed to continue to periodically review her housing, consistent with its PAC obligations.

13

To the extent we have not addressed any of appellant's arguments, we are satisfied they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(D) and (E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0398-22