**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3839-19

OMAR TORRES,

    Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

    Respondent.

_____

Argued December 13, 2021 – Decided December 23, 2021

Before Judges Vernoia and Firko.

On appeal from the New Jersey Department of Corrections.

Remi L. Spencer argued the cause for appellant (Spencer & Associates, LLC, attorneys; Remi L. Spencer, of counsel and on the brief).

Christopher C. Josephson, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Christopher C. Josephson, on the brief).

PER CURIAM

Omar Torres, formerly an inmate at the Southern State Correctional Facility (SSCF),[1] appeals from a final decision of the New Jersey Department of Corrections (DOC) upholding a hearing officer's determination he committed prohibited act *.252, encouraging others to riot, N.J.A.C. 10A:4-4.1(a)(1)(xii),[2] and imposing disciplinary sanctions.[3]  Having reviewed the record in light of the applicable legal principles, we are convinced there is insufficient evidence supporting the DOC's decision, and we reverse.

---

[1]  Torres was released on parole on August 10, 2020.  State of New Jersey, Department of Corrections, https://www20.state.nj.us/DOC-Inmate/details?x=1546674&n+90 (last visited Dec. 15, 2021).  The DOC agrees that because Torres is on parole, and his disciplinary record while incarcerated in State prison could affect his future release from prison if he violates parole, the issues raised on appeal are not moot.

[2]  Subsequent to its final decision in this matter, the Commission adopted a regulation consolidating prohibited act *.252, encouraging others to riot, into prohibited act *.251, rioting. Thus, the current regulation no longer includes prohibited act *.252, and prohibited act *.251 is now defined as "rioting or encouraging others to riot." See N.J.A.C. 10A:4-4.1(a)(1)(xx) (2021); 53 N.J.R. 923(a) (May 17, 2021).  The change has no effect on the disposition of this appeal.

[3]  Torres was transferred to South Woods State Prison (SWSP) immediately following the incident giving rise to the charge that he committed prohibited act *.252.

On April 9, 2020, Torres was one of sixty-three inmates incarcerated in SSCF's Housing Unit 2-Right (Unit 2R), which was designated as a temporary housing unit for inmates exposed to COVID-19. Unit 2R consists of a "day-space" and six separate wings with a capacity to house ninety-six inmates.

At approximately 9:20 p.m., DOC staff attempted to move twelve additional inmates into Unit 2R. As the twelve new inmates attempted entry into Unit 2R, inmates already in the unit "began yelling, cursing, and demanding" that the twelve other inmates not enter the unit. DOC staff then temporarily moved the twelve inmates to a different location.

At 9:30 p.m., DOC officers announced a "lock up" order requiring that all inmates in Unit 2R immediately "go down their wings, and get on their bunks until [a head] count has been conducted and cleared." Nonetheless, approximately ten minutes later, some inmates pushed a picnic table against a gate to block access to the unit. DOC Major Floyd Cossaboon reported that DOC Lieutenant Ernest "advised all inmates housed on Unit 2R that if they were not participating in the refus[al] to count and unit-wide disturbance[,] they were

3

to go down their wings and remain on their assigned bunks."[4] DOC officer Valentine noted in his report that "[m]any orders were given . . . to count up and go down th[eir] wings. All orders were ignored. [The inmates] continued to be disruptive."

Major Cossaboon's report states that despite Lieutenant Ernest's order, and other repeated orders made over the public address system, "[a]t no time was any inmate observed to have counted up as ordered and remain on their assigned bunk." Major Cossaboon further explained the inmates' "[un]authorized entering and exiting of the day-space and usage of the phones and kiosks contributed to the" disturbance and "comprised the safe and orderly running of the institution."

The DOC's Special Operations Group and "K[-]9 [Unit]" were deployed to SSCF to quell the riot. They secured the unit, and by 3:30 a.m. the following morning, all sixty-three Unit 2R inmates were identified, processed, and transported to SWSP.

On April 11, 2020, DOC Lieutenant Chard served Torres with a Disciplinary Report charging Torres with committing prohibited act *.252,

---

[4] Where the record on appeal does not disclose either the first name or surname of a DOC employee, we use the names provided. We intend no disrespect in doing so.

A-3839-19

encouraging others to riot. N.J.A.C. 10A:4-4.1(a)(1)(xii). The report alleged that on April 9, 2020, Torres and the sixty-two other inmates assigned to Unit 2R "yell[ed], curs[ed], and demand[ed] that no other inmates be housed in the" unit; "pushed [a] large unit table in front of the tier entrance"; threatened violence against the officers and new inmates if they attempted to enter the unit; and ignored orders to disperse "and present themselves to be removed from the" unit.

Torres pleaded not guilty to the charge, asserting he "was on the phone [and] then down [his] wing" during the incident. He was assigned counsel substitute and requested that the DOC obtain statements from two other inmates. One inmate stated he was "standing on the wing with a group of guys, talking and convers[ing] when everything was going on," and that he "was talking to inmate Torres." The other inmate said he helped Torres make his bed at 9:00 p.m. and that Torres "got on the phone [at] 9:15 [p.m.] and 9:25 [p.m.]."[5]

The hearing officer granted Torres' request for confrontation with Lieutenant Ernest and two DOC officers, Valentine and Russo, through written questions. In response to Torres' questions, Lieutenant Ernest and officers

---

[5] We note the disturbance did not begin until 9:30 p.m., and it was not until then that the inmates were first ordered to return to their bunks for a head count.

Valentine and Russo each stated they could not identify "any inmate NOT involved in the incident." Officers Valentine and Russo both admitted they "could [not] see anyone in their bed area to determine if anyone was complying with the issued orders/procedures." Lieutenant Ernest explained he could not see into the inmates' bed areas because "[i]nmates were standing at the entrance of the unit wings blocking [his] view of the wings."

Counsel substitute submitted a written statement of position on Torres' behalf denying the charge and claiming the DOC lacked evidence Torres participated in the incident. The hearing officer also considered the written reports from various DOC officers, DOC records, the responses of the officers to Torres' confrontation questions, and a series of video recordings of the incident from SSCF's security cameras.

In her written decision, the hearing officer acknowledged she was "unable to identify [any] individual inmate" on the video recordings of the incident because the inmates "w[ore] mask[s] and fac[ed] the gate" against which the picnic table was pushed. The hearing officer also rejected what she interpreted as Torres' defense, finding that "standing out on the wing, is not being on your bunk for count, which [adds] to the overall chaos and rioting behavior." The hearing officer further found the video recordings "show[] [the] majority of

inmates [from Unit 2R] congregating in the dayroom, disobeying orders and rules given."

Although she determined "it is not known what each inmate's specific role was in the disturbance," and there is no evidence Torres is captured on any of the video recordings, the hearing officer nevertheless found Torres guilty of encouraging others to riot by failing to comply with orders that inmates return to their bunks pending a head count. More particularly, the hearing officer made the following limited findings of fact supporting her determination Torres committed the charged offense:

> 1. [Torres] was part of a group that received orders. (PA System announced count up at 9:30 p.m.)[.]
>
> 2. The orders were of such a nature that any reasonable person would have understood the orders, (inmates were given several orders from officers [and] lieutenant to go down their wings)[.]
>
> 3. The orders were loud enough that the entire group could have heard the orders[.]
>
> 4. [Torres] had ample time to comply with the order[.]
>
> 5. No inmate, after receiving warnings, complied with staff orders, (video shows inmates did not disperse).
>
> 6. [Torres] was part of the group [residing in Unit 2R] as evidenced by the escort reports [taken by prison staff after securing all inmates present in Unit 2R.]

7

> The above findings support [the charge that Torres] encouraged inmates to riot.

The hearing officer further reasoned that "[j]ust because [Torres] was not seen actually pushing the table, does not mean he wasn't involved by yelling, refusing orders and not being on his assigned bed during count." The hearing officer concluded that "[a]ny behavior that is not compliant with [the] staff orders can be viewed as encouraging and inciting a non-[compliant] behaviors."

The hearing officer found Torres committed prohibited act *.252, encouraging others to riot, and imposed the following sanctions: 210 days of administrative segregation, ninety days loss of commutation time, and ten days loss of recreation privileges. Torres administratively appealed the hearing officer's decision, and on May 6, 2020, DOC Associate Administrator Michael Ridgeway upheld the finding of guilt and the sanctions imposed. Associate Administrator Ridgeway determined the video recordings "support[] that all inmates were actively engaged in the incident whether acting out OR refusing to disp[e]rse." This appeal followed.

## II.

Our scope of review of an agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011); Malacow v. N.J. Dep't of Corr., 457 N.J. Super. 87, 93 (App. Div. 2018). Reviewing courts presume the validity of the

A-3839-19

"administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014).  "We defer to an agency decision and do not reverse unless it is arbitrary, capricious[,] or unreasonable or not supported by substantial credible evidence in the record."  Jenkins v. N.J. Dep't of Corr., 412 N.J. Super. 243, 259 (App. Div. 2010).

In determining whether an agency's action is arbitrary, capricious, or unreasonable, we consider in part "whether the record contains substantial evidence to support the findings on which the agency based its action."  Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citation omitted).  "'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 192 (App. Div. 2010) (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)).  The term has also been defined as "evidence furnishing a reasonable basis for the agency's action."  McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 562 (2002).

As we have long recognized, "[p]risons are dangerous places, and the courts must afford appropriate deference and flexibility to administrators trying to manage this volatile environment."  Russo v. N.J. Dep't of Corr., 324 N.J. Super. 576, 584 (App. Div. 1999).  A reviewing court "may not substitute its

own judgment for the agency's, even though the court might have reached a different result." Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 482 (2007)). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)).

However, our review of a final agency decision is not "perfunctory," nor is it "our function . . . merely [to] rubberstamp an agency's decision[.]" Figueroa, 414 N.J. Super. at 191 (citation omitted). We are required "to engage in a careful and principled consideration of the agency record and findings." Ibid. (quoting Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)). An agency's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Torres argues the hearing officer's determination, which the DOC adopted, is not supported by substantial evidence establishing he encouraged others to riot. We agree. The record is devoid of evidence supporting the hearing officer's determination and the DOC's final decision that Torres encouraged others to riot. To be sure, the evidence established both a riotous disturbance in Unit 2R, and an apparent failure by many, and perhaps most, of

the inmates to comply with repeated orders to leave the day-space and return to their wings and to their bunks. Conspicuously absent from the record presented to the hearing officer is any evidence Torres actually participated in the disturbance or failed to return to his bunk.

The hearing officer recognized the dearth of evidence against Torres. She expressly found "it is not known what each inmate's specific role was in the disturbance," and she "was unable to identify [any] individual inmate" in the video recordings of the disturbance. Thus, even the hearing office recognized there is no evidence Torres was in the day-space where the disturbance and blockage of the gate occurred, or that he was one of the inmates who refused to disperse.

Indeed, the hearing officer did not find defendant encouraged others to riot by moving the table to block the entrance to the unit or by otherwise being directly involved in the riotous conduct of some of the inmates. The hearing officer found defendant encouraged the riot only by failing to comply with the repeated orders that he return to his bunk and await a head count. On appeal, the DOC recognizes there is no evidence Torres directly participated in the disturbance in the day-space or that he failed to disburse from that location after

11

the disturbance began; the DOC argues only that Torres committed prohibited act *.252 by failing to follow orders to return to his bunk for a head count.

The record, however, is bereft of any evidence Torres failed to comply with the orders. The DOC did not present any direct evidence Torres did not comply with the orders, return to his bunk, and await a head count, and the DOC does not point to any evidence establishing Torres violated the orders. In fact, Lieutenant Ernest, and DOC officers Valentine and Russo, admit in their responses to Torres's written confrontation questions that they were unable to see if any of the inmates, including Torres, returned to their bunks pursuant to the orders.

Despite this admitted inability of the DOC's witnesses to observe whether inmates returned to their bunks for a head count, each of them illogically asserted that not one of the inmates were observed complying with the orders. In other words, the DOC's case against Torres is based on a claim neither he nor any other inmate returned to their bunks for the head count, but the DOC's witnesses admit they could not observe whether inmates returned to their bunks for the head count.[6] The hours of video recordings of Unit 2R during the incident

---

[6] Major Cossaboon's statement "[a]t no time was any inmate observed to have counted up as ordered or remain on their assigned bunk" is illogically based on the same evidence.

do not support the DOC's claim; they do not show whether Torres returned to his cell, sat on his bunk, and waited for a head count, or not.

We also reject any claim Lieutenant Ernest's and officers Russo's and Valentine's statements that they could not identify "any inmate NOT involved in the incident" support a finding Torres failed to comply with the lock-down orders. The inability of the respective officers to identify inmates not involved in the incident does not constitute affirmative evidence that any inmate, including Torres, was involved in the incident. Rather, the statements simply confirm the officers' lack of any information establishing Torres committed the charged offense.

In sum, the DOC failed to present any evidence Torres did not comply with the orders directing that he "lock down." Indeed, the hearing officer's findings of fact do not include a specific determination that Torres took any action, or failed to take any action, that encouraged others to riot. Instead, the hearing officer more generically determined that all the inmates failed to comply with the orders and, by implication, found Torres committed the prohibited act. As the hearing officer aptly recognized, the DOC did not present any other evidence from which it could be properly concluded Torres participated in the April 9, 2020 incident.

A-3839-19

Torres's statement in response to the charges – that he was on his wing and on the phone – also does not support the hearing officer's determination he failed to comply with the lock-down orders. Torres' statement has no temporal context. That is, his terse statement does not detail the time he was on his wing or on the phone.

Moreover, the incident began at 9:30 p.m., and the DOC's own evidence shows Torres was not on the telephone after the incident started. The DOC's records list the names of all inmates who used the Unit 2R phones "after 9:30 [p.m.] on" April 9, 2020, and Torres' name is not included. Thus, Torres' statement he used the phone could only properly support the conclusion that he was on the phone on the wing prior to the commencement of the incident at 9:30 p.m. and the subsequent lock-down orders. Torres's other statement, that he was on the wing during the disturbance, also does not support a finding he encouraged others to riot; the DOC ordered all inmates to go to their wings after the disturbance began.

We do not discount the dangers and institutional issues presented by inmates who, in the face of the COVID-19 pandemic, violate DOC rules en masse, create a riotous disturbance, and disregard orders designed to return order and safety to the facility. Those circumstances, however, do not relieve the DOC

14

of presenting substantial evidence supporting disciplinary charges that may result in serious sanctions affecting the length and conditions of an inmate's incarceration.

Here, the hearing officer's and DOC's determinations Torres encouraged others to riot are untethered to any evidence in the record. Because "disciplinary actions against inmates must be based on more than a subjective hunch, conjecture[,] or surmise of the factfinder," Figueroa, 414 N.J. Super. at 191, we reverse.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION