NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1500-21
                A-1710-21

STATE SHORTHAND
REPORTING SERVICES,

      Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

      Respondent-Respondent.

_____

JERSEY SHORE REPORTING,
LLC,

      Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

      Respondent-Respondent.

_____

Submitted  (A-1500-21)  and  Argued  (A-1710-21)
January 16, 2024 — Decided February 12, 2024

Before Judges Mawla, Marczyk, and Chase.

On appeal from the New Jersey Department of Labor and Workforce Development, Docket Nos. 14-001 and 14-003.

Martin Melody, LLC, attorneys for appellant State Shorthand Reporting Services, Inc. in A-1500-21 (Eugene J. Melody, of counsel; Nancy S. Martin, on the briefs).

James Prusinowski argued the cause for appellant Jersey Shore Reporting, LLC in A-1710-21 (Trimboli & Prusinowski, LLC, attorneys; James Prusinowski and Brittany Rose Naimoli, on the briefs).

Ryne Anthony Spengler, Deputy Attorney General, argued the cause for respondent Department of Labor and Workforce Development (Matthew J. Platkin, Attorney General, attorney; Donna Sue Arons, Assistant Attorney General, of counsel; Kendall James Collins, Deputy Attorney General, on the briefs).

Einhorn, Barbarito, Frost & Botwinick, PC, attorneys for amicus curiae Certified Court Reporters Association of New Jersey in A-1710-21 (Andrew Seth Berns, of counsel and on the brief; Matheu D. Nunn, on the brief).

The opinion of the court was delivered by

MARCZYK, J.A.D.

In this appeal, as an issue of first impression, we are asked to consider whether N.J.S.A. 43:21-19(i)(10)—from the time of its enactment in 2010—provides an exemption for court reporters under the Unemployment Compensation Law ("UCL"), N.J.S.A. 43:21-1 to -71, or whether court reporters

must still establish a Federal Unemployment Tax Act ("FUTA") exemption pursuant N.J.S.A. 43:21-19(i)(1)(G). For the reasons set forth below, we have determined N.J.S.A. 43:21-19(i)(10) does provide such an exemption and there is no requirement for court reporters to establish a FUTA exemption.

We consolidate these two appeals for the purpose of issuing a single opinion. Petitioner Jersey Shore Reporting, LLC ("JSR") appeals from a December 31, 2021 final administrative action of the Commissioner of the Department of Labor and Workforce Development ("DOL") finding JSR liable for contributions under the UCL. Petitioner State Shorthand Reporting Services ("SSRS") also appeals from the Commissioner's December 31, 2021 final administrative action finding SSRS responsible for contributions under the UCL. Although we conclude SSRS and JSR are entitled to an exemption under N.J.S.A. 43:21-19(i)(10), the DOL audited SSRS and JSR for time periods both before and after that statute's January 16, 2010 effective date. We conclude the exemption applies to the audit dates after January 16, 2010.

Regarding the audit periods prior to January 16, 2010, we address in the unpublished portion of this opinion whether JSR and SSRS satisfied N.J.S.A. 43:21-19(i)(6)(A) to (C) ("the ABC test") for the purpose of establishing that the reporters were independent contractors during that time period. We determine the Commissioner did not act in an arbitrary or capricious manner in

finding petitioners failed to satisfy the ABC test. Accordingly, we reverse in part, affirm in part, and remand for the Commissioner to recalculate the assessments owed by petitioners consistent with this opinion.

I.

A.

We derive the following from the record as it pertains to JSR. JSR is a registered court reporting agency that provides legal transcription services to attorneys, courts, and public agencies. The owners of JSR are not court reporters and therefore only handle administrative matters and brokering the services of court reporters. JSR fills numerous court reporting jobs each day and solicits reporters with a mass email based on reporters' preference concerning the location of the job and days and hours they are available. Generally, the first reporter to respond gets the assignment. Reporters are not forced to take an assignment and do not suffer any consequences for not agreeing to take a job. If JSR cannot fill a slot, it reaches out to other agencies. Reporters are provided the time and location of an assignment, but no specific instructions.

Once an event is completed, the reporter will inform JSR as to how many transcripts have been requested, and JSR prints, delivers, and bills for the services. Reporters can be compensated for an appearance, or an hourly rate when no transcript is ordered, or on a per-page rate. Reporters who work with

JSR also work with other agencies. The reporters provide their own stenographic machines. JSR does not: have policies or procedures for reporters; require reporters to work a certain number of hours; provide supplies; proofread reporters' work; or pay for supplies or continuing education.

In August 2013, following an audit, the DOL assessed JSR for $39,236.06 in unpaid contributions to the DOL's unemployment and disability benefit funds as a result of an audit from 2008-2010.[1] In January 2015, JSR moved for summary decision, asserting it was not liable for the contributions. The administrative law judge ("ALJ") determined there were genuine issues of material fact regarding whether the ABC test was met that necessitated a hearing regarding JSR's liability for 2008 and 2009. The ALJ granted JSR's motion for summary decision for the 2010 time period, finding N.J.S.A. 43:21-19(i)(10) "amended the UCL . . . to specifically exempt services performed by legal transcribers or court reporters irrespective of a parallel exemption under" the FUTA.

On April 23, 2018, the DOL requested the Commissioner review the ALJ's initial decision. On July 19, 2018, the Commissioner issued a decision and

---

[1] The parties unsuccessfully attempted to mediate. In May 2014, JSR moved for leave to appeal because the Office of Administrative Law ("OAL") failed to transfer the contested case for a hearing. In May 2014, we ordered the case transferred to the OAL for a hearing as a contested case.

accepted the ALJ's denial of summary decision for the audit years of 2008 and 2009 but rejected the ALJ's summary decision for the audit year of 2010 based on N.J.S.A. 43:21-19(i)(10). The Commissioner instead relied on N.J.S.A. 43:21-19(i)(1)(G), which states:

> Notwithstanding any other provision of this subsection, service in this State with respect to which the taxes required to be paid under any federal law imposing a tax against which credit may be taken for contributions required to be paid into a state unemployment fund or which as a condition for full tax credit against the tax imposed by the [FUTA] is required to be covered under the [UCL] . . . .

According to the Commissioner, N.J.S.A. 43:21-19(i)(1)(G) provides the mere existence of a state exemption under N.J.S.A. 43:21-19(i)(10) is not enough, and there must also be a parallel FUTA exemption to be relieved of the obligation to pay unemployment taxes.

### B.

SSRS is also a court reporting agency that provides transcription services to various entities. It notes court reporters are "strictly regulated" and are licensed through the Department of Consumer Affairs. They must pass a test administered through a national court reporting association to become licensed in New Jersey. The owner and operator of SSRS testified:

> She maintains a list of certified court reporters and assigns jobs to cover a court reporting project on an as needed basis. Most of the court reporters may work for

several different court reporting agencies at any given time and do not work exclusively for [SSRS]. In addition, they may accept or reject any assignment that [SSRS] offers them. Once a reporter accepts a job, they are given the date, time[,] and location of the job. The reporters are responsible for their own equipment, travel[,] and other job-related expenses. Once a reporter transcribes a proceeding, he or she emails it to [SSRS] for delivery to the client. [SSRS] handles all the billing.

SSRS maintains it does not control or provide instructions for court reporters. It asserts the reporters operate independently, are free to work whenever they want, and set their own work schedule.

In August 2013, the DOL assessed SSRS for unpaid contributions to unemployment and disability funds for the periods of 2006-2008 and 2011-2014. Based on an audit of those time periods, SSRS had unpaid contributions of $104,116.45—$38,340.44 for 2006-2008 and $65,776.01 for 2011-2014. SSRS appealed, and the matter was transferred to the OAL for a hearing before an ALJ as a contested case. The ALJ ultimately determined, based on the Commissioner's prior decision in the JSR matter, the exemption under N.J.S.A. 43:21-19(i)(10) requires a parallel FUTA exemption.

## II.

### A.

JSR and SSRS argue they meet the exemption under N.J.S.A. 43:21-19(i)(10) and therefore are not liable. They argue the statutory language is clear

A-1500-21

7

and unambiguous and that services provided by certified court reporters should not be considered employment subject to the UCL. Moreover, the legislative history of N.J.S.A. 43:21-19(i)(10) supports this interpretation.

JSR contends the Commissioner erred in finding N.J.S.A. 43:21-19(i)(1)(G) applies to N.J.S.A. 43:21-19(i)(10), thus requiring court reporters to establish a FUTA exemption. It argues the statute's context and relationship to surrounding provisions shows N.J.S.A. 43:21-19(i)(1)(G) does not apply to every provision in N.J.S.A. 43:21-19(i). According to JSR, the statute's hierarchy shows N.J.S.A. 43:21-19(i)(1)(G), a sub-sub-section, is contained in and applies only to the provisions in subsection N.J.S.A. 43:21-19(i)(1). That is, the provision states it applies "[n]otwithstanding any other provision of this subsection," but JSR contends that it is meant to apply to the actual subsection of N.J.S.A. 43:21-19(i)(1), not the entire section of N.J.S.A. 43:21-19(i).

JSR argues the Legislature intended to amend the statute to remove the FUTA exemption from N.J.S.A. 43:21-19(i)(10) requirements. If N.J.S.A. 43:21-19(i)(1)(G) imposed the FUTA exemption on all of N.J.S.A. 43:21-19(i), JSR argues there would have been no modification to the statute. A FUTA exemption was required prior to the 2010 amendment, so it follows the Legislature amended the statute to exempt court reporters. Requiring reporters to prove a FUTA exemption would render the 2010 amendment meaningless.

JSR argues if the Legislature wanted to require a FUTA exemption on all categories under the statute, it would have clearly articulated the requirement. For example, N.J.S.A. 43:21-19(i)(7), which provides for twenty-seven exemptions, qualifies the exemptions, noting they are available "[p]rovided that such services are also exempt under the [FUTA] . . . ." JSR notes that if N.J.S.A. 43:21-19(i)(1)(G) applied to the entire statute, N.J.S.A. 43:21-19(i)(7) would be redundant as it refers to the same tax credits and FUTA. As such, JSR and SSRS assert the language of N.J.S.A. 43:21-19(i)(10) is clear and unambiguous, and court reporting services are statutorily exempt from unemployment taxes.

Amicus curiae Certified Court Reporters Association of New Jersey ("CCRA") also contends N.J.S.A. 43:21-19(i)(10) is clear on its face, and the legislative history explains that court reporters are now considered independent contractors. Moreover, there is no basis to continue to require a corresponding FUTA exemption under N.J.S.A. 43:21-19(i)(1)(G) given the enactment of N.J.S.A. 43:21-19(i)(10). Furthermore, the Commissioner's interpretation would render the amendment superfluous, and if the Legislature intended for the FUTA exemption to still apply, there would have been no need to amend the statute.

B.

Although we review administrative decisions with a deferential standard of review, "a reviewing court is 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue.'" Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018) (alteration in original) (quoting Dep't of Children & Fams. v. T.B., 207 N.J. 294, 302 (2011)). "[If] an agency's determination . . . is a legal determination, the appellate court's review is de novo." K.K. v. Div. of Med. Assistance and Health Servs., 453 N.J. Super. 157, 161 (App. Div. 2018) (alteration in original) (quoting L.A. v. Bd. of Educ. of Trenton, Mercer Cnty., 221 N.J. 192, 204 (2015)).

"The overriding goal" of statutory interpretation "is to determine . . . the intent of the Legislature, and to give effect to that intent." State v. Hudson, 209 N.J. 513, 529 (2012). We begin with the understanding "the language of the statute, and the words chosen by the Legislature should be accorded their ordinary and accustomed meaning." Ibid. "Where the plain language of a statute is clear, we enforce the statute as written." Correa v. Grossi, 458 N.J. Super. 571, 579 (App. Div. 2019) (citing DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

Moreover, "[i]f the language leads to a clearly understood result, the judicial inquiry ends without any need to resort to extrinsic sources." Hudson, 209 N.J. at 529. "[E]xtrinsic aids may not be used to create ambiguity when the

A-1500-21

plain language of the statute itself answers the interpretative question; however, when the statutory language results in more than one reasonable interpretation, then resort may be had to other construction tools . . . in the analysis." Id. at 529-30 (citing State v. Shelley, 205 N.J. 320, 323-24 (2011)). These may "includ[e] legislative history, committee reports, and contemporaneous construction." DiProspero, 183 N.J. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

N.J.S.A. 43:21-19(i)(10) in pertinent part provides:

> Services performed by a legal transcriber, or certified court reporter certified pursuant to P.L.1940, c.175 [N.J.S.A. 45:15B-1 to -14)], shall not be deemed to be employment subject to the [UCL], [N.J.S.A. 43:21-1 to -71], if those services are provided to a third party by the transcriber or reporter who is referred to the third party pursuant to an agreement with another legal transcriber or legal transcription service, or certified court reporter or court reporting service, on a freelance basis, compensation for which is based upon a fee per transcript page, flat attendance fee, or other flat minimum fee, or combination thereof, set forth in the agreement.
>
> [(Emphasis added).]

The express language of N.J.S.A. 43:21-19(i)(10) provides that services performed by court reporters "shall not be deemed to be employment subject to" the UCL. This provision is not qualified by reference to any FUTA exemption. Prior to 2010, under N.J.S.A. 43:21-19(i)(7)(Y), court reporters were also

exempt, provided they were "also exempt under . . . FUTA . . . ." N.J.S.A. 43:21-19(i)(7)(Y) (2002). We presume the Legislature understood the implications of removing court reporters from N.J.S.A. 43:21-19(i)(7)(Y) and the corresponding FUTA mandate and placing the amendment in a different section, specifically indicating that court reporting services are not to be considered employment under the UCL. This amendment was designed so that court reporters would no longer be required to establish a FUTA exemption pursuant to N.J.S.A. 43:21-19(i)(7) and were, by the specific terms of the amendment, not to be considered employees, but rather independent contractors. The Commissioner's interpretation is at odds with the plain language of the statute.

The DOL asserted before the Commissioner that the Legislature may have been "well intentioned" in adopting N.J.S.A. 43:21-19(i)(10) and attempting to grant an exemption to court reporters, but the Legislature was unsuccessful because N.J.S.A. 43:21-19(i)(1)(G) still requires that petitioners establish a FUTA exemption. At oral argument, the DOL claimed the amendment set forth in N.J.S.A. 43:21-19(i)(10) was effectively meaningless.

It is a "well-established canon of statutory interpretation" that the Legislature is presumed to know the "judicial construction of its enactments." Johnson v. Scaccetti, 192 N.J. 256, 276 (2007) (quoting DiProspero, 183 N.J. at 494), abrogated on other grounds, Cuevas v. Wentworth Grp., 226 N.J. 480, 506

(2016). Moreover, "[t]he Legislature is presumed to be familiar with its existing enactments and is presumed to intend that its newer enactments be harmonized with the existing ones, in light of the Legislature's purpose." Correa, 458 N.J. Super. at 580. In attempting to harmonize more recent amendments in the context of existing statutory provisions, as always "[w]e will 'strive for an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void[,] or insignificant.'" Sanchez v. Fitness Factory Edgewater, LLC, 242 N.J. 252, 261 (2020) (second alteration in original) (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 172 (1999)).

The Commissioner's interpretation of N.J.S.A. 43:21-19(i)(10) indicates the Legislature failed to recognize the requirement under N.J.S.A. 43:21-19(i)(1)(G) for an employer to still establish a FUTA exemption. The DOL asserted there are no scenarios in which the new statute, N.J.S.A. 43:21-19(i)(10), would apply to court reporters that was distinct from the operation of the prior exemption under N.J.S.A. 43:21-19(i)(7)(Y). We reject such an interpretation, which would render N.J.S.A. 43:21-19(i)(10) meaningless. N.J.S.A. 43:21-19(i)(10) must be read in harmony with N.J.S.A. 43:21-19(i)(7)(Y). The Legislature was fully aware of the prior requirement for court reporters to establish a FUTA exemption under N.J.S.A. 43:21-19(i)(7)(Y), which is why it amended the statute to remove the requirement for a FUTA

exemption under N.J.S.A. 43:21-19(i)(10). The Legislature placed N.J.S.A. 43:21-19(i)(10) in a separate section, presumably to remove it from N.J.S.A. 43:21-19(i)(7), which requires a corresponding FUTA exemption. Moreover, we agree with JSR that the requirement to establish a FUTA exemption under N.J.S.A. 43:21-19(i)(1)(G) only applies to that specific subsection.

Although we agree a sensible reading of N.J.S.A. 43:21-19(i)(10) provides an exemption for court reporters, to the extent the statutory language results in more than one reasonable interpretation, the legislative history unequivocally establishes the Legislature intended to dispense with the requirement to establish a FUTA exemption. The Senate Labor Committee statement provided:

> [T]he bill makes an individual who is a legal transcriber and who works on a freelance basis, compensation for which is based upon a fee per transcript page, flat attendance fee, or other flat minimum fee, or combination thereof, ineligible for unemployment insurance (UI) benefits and thus not subject to UI taxes. The bill provides the exemption to all such individuals categorically without requiring a demonstration that particular individuals are self-employed under the standards provided by either the State UI statute or federal tax rules.
>
> . . . .
>
> The amendments also remove the requirement that the exemption applies only if there is a parallel exemption under federal UI law or if the individuals are found to be self-employed by the IRS under its tax rules.

[S. Labor Comm. Statement to S. 825 (May 4, 2009) (emphasis added).][2]

The legislative history is unambiguous regarding the elimination of the requirement for a FUTA exemption and bolsters our interpretation of the statute. Accordingly, we reverse the Commissioner's holding with respect to the applicability of N.J.S.A. 43:21-19(i)(10) and conclude petitioners are exempt from the time of the enactment of the statute in 2010. We remand for the Commissioner to calculate the assessment regarding those audit periods after the enactment of N.J.S.A. 43:21-19(i)(10).

## III.

We next address the Commissioner's separate determination that petitioners failed to establish they were independent contractors under the ABC test.

## A.

In July 2020, the Commissioner remanded JSR's case to the ALJ for an evidentiary hearing regarding the 2008-2010 audit period. In September 2020, following a hearing, and after evaluating the ABC test, the ALJ found JSR had no liability for the entire audit period as the court reporters were independent

---

[2] The Assembly Labor Committee statement closely mirrors the Senate's legislative history. See A. Labor Comm. Statement to A. 3770 (Jan. 4, 2010).

contractors. As to prong A, the ALJ determined the reporters were generally free from JSR's control because they were not trained by JSR, were free to choose when to work, and could work for competitors. As to prong B, the ALJ found the court reporters did not work out of JSR's offices, but rather from client locations.[3] Under prong C, the ALJ found the reporters were free to provide services to other agencies while continuing to accept work from JSR. He further found the reporters could likely continue to work with different agencies if a particular agency failed or went out of business. Thus, according to the ALJ and citing Hargrove v. Sleepy's LLC, 220 N.J. 289, 306 (2015), they had a profession "that will plainly persist despite the termination of the challenged relationship," and JSR met prong C.

On December 31, 2021, the Commissioner rejected the ALJ's decision. Concerning prong A, although the Commissioner noted the reporters had "some flexibility" in their work, he found critical aspects of the reporters' work were controlled by JSR. The Commissioner noted the key components of the work— finding and maintaining relationships with clients, setting the rate charged to clients and reporters, determining when work must be completed, and recovering from clients who fail to pay—"are all set by [JSR]." The "major formal

_____

[3] The ALJ noted there were rare circumstances in which work was performed at the office, such as when a client did not have an available conference room.

elements" of employment were all controlled by the agency. As such, the Commissioner determined JSR failed to meet prong A.

Under prong B, the Commissioner found the ALJ ignored the fact JSR is in the business of providing court reporting services to the legal community, and therefore JSR's place of business is in some part located at client locations within the legal community. He found:

> Much of the actual work, therefore, takes place in these locations . . . . These services are an integral part of [JSR]'s business, and delivery of services in these locations is not a random occurrence. Rather, it is specifically determined at the time of acceptance of the contract with [JSR]. These client locations, therefore, must under Carpet Remnant[ Warehouse, Inc. v. N.J. Department of Labor, 125 N.J. 567 (1991),] be considered an extension of [JSR]'s place of business.

Under prong C, the Commissioner found the ALJ "largely ignored the results of the [DOL]'s thorough audit." He explained:

> In conducting an audit for potential misclassification, it is standard [DOL] practice to contact the purported employer and all purported subcontractors and request that they submit documentation (such as tax returns, business cards, invoices, letterhead, advertisements they have taken out, insurance, and other 1099s) that would help the [DOL] to determine their employment status. . . . Since there was no real dispute over whether remuneration had been paid to the court reporters for their services, that established a presumption of employee status unless [JSR] could meet each prong of the ABC test. In practice, as testified to by [the] redetermination auditor . . . , this meant that if a purported employer did not

17

provide the [DOL] with relevant documents, the [DOL] could lawfully infer that the individual was likely an employee, as no information was provided to rebut the presumption of employee status. . . .

The Commissioner further noted:

> The audit record shows that [JSR] provided documentation for slightly less than half of the court reporters that it engaged.[4] . . . The company did not submit any documents, and no other evidence, to rebut the lawful presumption that its remaining court reporters (totaling 52.3%) were not customarily engaged in an independently established business.

The Commissioner further analyzed Schedule C tax forms for several court reporters received by the DOL and found "only a small number showed true independence." He noted multiple reporters clearly earned the entirety of their annual income from JSR in the 2008-2010 span. Two of them also had JSR business cards with their names on it. Multiple other reporters earned more than ninety percent of their annual income from JSR during the audit period. The

---

4 The Commissioner noted:

> In 2008, out of [thirty-two] court reporters engaged by [JSR], the [DOL] only received documents for [fifteen]. . . . In 2009, out of [thirty] court reporters engaged by [JSR], the [DOL] only received documents for [fifteen]. . . . And in 2010, out of [thirty-one] court reporters engaged by [JSR], the [DOL] only received documents for [fourteen]. . . . Adding it together, out of [ninety-three] court reporters engaged by [JSR] during the audit period, the [DOL] received documentation for only [forty-four] (totaling 47.3%).

Commissioner noted these "purported[] independent contractors were in reality wholly dependent upon [JSR]."

The ALJ noted that if one agency went out of business, the reporters would be able to secure work from another agency. The Commissioner, quoting <u>Carpet Remnant</u>, found this was insufficient to overcome the presumption of employee status because it did not demonstrate the reporters could "continue to exist independently and apart from" their relationship with JSR as an independent business. 125 N.J. at 592. Therefore, the Commissioner concluded JSR failed to meet prong C.

Regarding the proceedings against SSRS, the matter was assigned to an ALJ, who ordered the matter be placed on the inactive list pending the processing of an Internal Revenue Service ("IRS") Form SS-8.[5] On July 14, 2016, the IRS issued an "information letter" to SSRS, which stated "based solely on the information you provided . . . we conclude that an employer/employee relationship does not exist in the situation you described." However, the letter also stated it "isn't a determination letter and isn't binding."

---

[5] IRS Form SS-8 asks the IRS to determine whether under federal law a worker is considered an employee or independent contractor for purposes of federal employment and income taxes. The parties theorized its outcome would affect the pending case.

The matter was subsequently assigned to a different ALJ. In June 2017, SSRS filed a motion for summary decision. The ALJ found there were genuine issues of material fact that necessitated a hearing to determine SSRS's liability for the 2008-2009 audit period. She thus denied SSRS's motion for summary decision regarding the 2008-2009 period. Regarding liability from 2011 onward, the ALJ stated the Legislature "amended the UCL in 2010 to specifically exempt services performed by legal transcribers . . . ." However, the ALJ found it was an "open question" whether a corresponding FUTA exemption was required to assert the specialized exemption under N.J.S.A. 43:21-19(i)(7), (i)(9), and (i)(10). Therefore, summary decision on liability for the 2011-2014 period was also denied because there was a genuine issue of material fact "as to the effect and extent of the amendments to the UCL, and the need for a corresponding FUTA exemption."

In October 2019, the ALJ found SSRS had no liability for either audit period. She cited the Commissioner's prior decision involving JSR, stating in a footnote the DOL "has ruled that the intention of [the 2010 legislative amendment to the UCL] was to provide for an exemption, only when someone has received a corresponding FUTA exemption." In the footnote, the ALJ also stated "[n]o corresponding FUTA exemption was demonstrated in this case." However, she did not clearly determine whether SSRS established a FUTA

20

exemption. She went on to analyze whether the court reporters were independent contractors under N.J.S.A. 43:21-19(i)(6)(A), (B), and (C), thereby exempting them from UCL coverage. The ALJ ultimately determined SSRS satisfied prongs A, B, and C for many of the same reasons as the ALJ in the JSR case above.

On December 31, 2021, the Commissioner reversed the ALJ's initial decision and held a putative employer must establish both a UCL exemption and a FUTA exemption in order to assert the specialized exemption, and SSRS did not establish a FUTA exemption. The Commissioner noted N.J.A.C. 12:16-23.2[6] permits three methods for a putative employer to establish a FUTA exemption:

> (a) Evidence that services are not covered under FUTA may include among other things:
>
> 1.    Private letter ruling(s) from the [IRS];
>
> 2.    An employment tax audit conducted by the [IRS] after 1987 which determined that there was to be no assessment of employment taxes for the services in question; however, the determination must not have been the result of the application of Section 530 of the Revenue Act of 1978; or
>
> 3.    Determination letter(s) from the [IRS].

---

[6] Prior to 2018, a putative employer could provide documentation of responses to the twenty-point test required by the IRS to meet the criteria for independence, but the DOL amended the regulation that year to limit it to the three current forms of proof. 50 N.J.R. 1026(a) (Mar.19, 2018).

The Commissioner pointed out that in adopting N.J.A.C. 12:16-23.2, the DOL stated "the entire purpose of the proposed amendment is that the [DOL] would no longer be conducting its own analysis under the IRS test for independence in order to determine the existence of a FUTA exemption." 50 N.J.R. 2012(a) (Sept. 17, 2018). The Commissioner found SSRS did not establish a FUTA exemption under any of the three methods because the IRS letter SSRS obtained did "not make a formal finding as to whether [SSRS] has established a FUTA exemption under the IRS test." Therefore, SSRS was not exempt from UCL coverage under N.J.S.A. 43:21-19(i)(10).

The Commissioner also disagreed with the ALJ in her application of the ABC test. As to prong A, he found "critical aspects of the reporters' work were controlled by [SSRS]." The Commissioner found SSRS "was responsible for finding the work in the first place." The company also "negotiated the rate that was charged to clients without input from the reporters" and "the reporters were paid whether or not a client pays the company, placing the risk of loss entirely on the company." SSRS also handled client management, not the reporters themselves, and "the company performed most of the administrative work of producing the transcript, billing clients, and scheduling court reporters." The Commissioner found these characteristics were "indicative of employee status, as it vests the company with authority over significant formal elements of

employment. . . . [SSRS] exercises effective control and direction over the performance of services."

Regarding prong B, the Commissioner determined that although the reporters perform services at remote locations,

> [t]hese services are an integral part of [SSRS]'s business, and delivery of services in these locations is not a random occurrence. Rather, it is specifically determined at the time of acceptance of the contract with [SSRS]. These client locations, therefore must under Carpet Remnant[, 125 N.J. at 592,] be considered an extension of [SSRS]'s place of business, as they constitute places "where the enterprise has a physical plant or conducts an integral part of its business."

The Commissioner found SSRS failed to meet prong C of the ABC test, explaining that when the DOL conducts an audit, it requests a variety of records from the employer and purported independent contractors, including tax returns, business cards, invoices, letterhead, advertisements they have taken out, insurance, and other 1099 records, to ascertain the employment status of the audited workers. Many of the court reporters SSRS utilized did not respond to the requests for information. The Commissioner noted, "[f]or the 2006-2008 period, . . . [SSRS] provided documentation that was of little value in rebutting the presumption of employee status. . . . [SSRS] provided a copy of a Yellow Pages directory for certified court reporters that listed five of its court reporters

on it, as well as sample invoices."[7]  The Commissioner observed, "[t]he [DOL]

only received one copy of an IRS Form Schedule C (which is a form submitted

to show profit and loss from a sole proprietorship) for this period."[8]  The

Commissioner further observed that if a purported employer did not provide

relevant documents, the DOL "could lawfully infer that the individual was likely

---

[7]  The Commissioner noted,

> [t]he [DOL]'s auditor received calls from three court
> reporters that were no longer with the company, who all
> stated that they never submitted their names to be
> advertised in the Yellow Pages directory, nor submitted
> the invoices presented by [SSRS]. . . .  The auditor
> concluded that these invoices were not created by the
> court reporters themselves, but rather were an internal,
> company-created document to determine each
> reporter's weekly pay.

[8]  The Commissioner noted:

> Being registered and filing taxes as a business can
> potentially show that an individual has met the C prong,
> though it is not dispositive.  A key element of the
> [DOL]'s analysis of a Schedule C [form] is the
> proportion of income that comes from each source, on
> the theory that the greater number of sources of income,
> the more likely that an individual can "continue to exist
> independently of and apart from" his relationship with
> his putative employer, and thereby show that he
> engages in an independent business under the C prong.
> Carpet Remnant[, 125 N.J. at 592-93].  But this single
> Schedule C did not demonstrate independence to the
> auditor's satisfaction.

an employee, as no information was provided to rebut the presumption of employee status."

Lastly, the Commissioner stated:

> In order to meet the C prong, it is not enough to establish that these reporters could pick up more work from another agency. Rather, it must be demonstrated that they could "continue to exist independently of and apart from" their relationship with [SSRS] as an independent business. Carpet Remnant[, 125 N.J.] at 592. Put another way, these reporters' purportedly independent businesses will not "plainly persist despite the termination of the challenged relationship," because for many of them they were never independent in the first place. Trauma Nurses, Inc. v. Board of Review, 242 N.J. Super. [135,] 142 [(App. Div. 1990)] . . . .

As a result of finding no UCL exemptions and that SSRS did not meet the requirements of the ABC test, he ordered SSRS to remit to the DOL $104,116.45 in unpaid unemployment and temporary disability contributions, plus any interest or penalties that may apply.

B.

JSR argues its reporters are independent contractors under the ABC test. It analogizes the facts of this case to Trauma Nurses. It argues reporters are free to choose when and where to work and are free to work with other agencies. Moreover, JSR does not perform evaluations, pay any expenses, or provide practices, procedures, training, equipment, or insurance benefits.

A-1500-21

25

Under prong A, JSR argues it does not exert a significant degree of control over reporters' work. For example, reporters can reject work with no consequences; it provides no direction for the work other than the job's date, time, and location; and it does not control the kind of equipment used by the reporter. Further, JSR points out some of the reporters subcontract their work.

Under prong B, JSR compares itself to the agency in Trauma Nurses, arguing it is a "broker" that places reporters with clients. It argues it merely facilitates a reporter to attend a proceeding according to the client's needs. As such, JSR engages reporters to perform work outside of JSR's core business, which is court reporter brokerage. JSR also argues the reporters work at proceedings at attorneys' offices, workers' compensation court, and doctors' offices, among other places. It further argues the Commissioner's decision is contrary to the principles in Carpet Remnant and East Bay Drywall, LLC v. Department of Labor, 251 N.J. 477, 496 (2022). See Carpet Remnant, 125 N.J. at 592 ("'[P]laces of business' . . . refers only to those locations where the enterprise has a physical plant or conducts an integral part of its business. . . . [T]he residences of [the business's] customers are clearly 'outside of all the places of business of [the business].'" (quoting N.J.S.A. 43:21-19(i)(6)(B))).

JSR argues prong C is satisfied because the reporters have a profession that will plainly persist despite termination of the work relationship. In the past,

it has engaged reporters who previously worked with agencies that went out of business for the exact same type of work.  It also references examples when it lost a contract, and the reporters were engaged by other agencies.  In short, the reporters "follow the work."  JSR further asserts the Commissioner incorrectly relied on the fact some reporters do not work with multiple agencies.  It argues the standard does not require the reporters to work regularly with other agencies but asks whether the reporters would get work with other agencies at the end of their relationship with JSR.[9]

SSRS contests the Commissioner's finding that significant aspects of the reporters' work were controlled by SSRS and argues it satisfied prong A.  It notes:  the court reporters were permitted to turn down assignments without discipline from the agency; they can work for competitors of SSRS; SSRS does not supply equipment to court reporters; SSRS does not proofread reporters' work; only reporters can make corrections to transcripts; and reporters testified they would continue in their profession if SSRS went out of business.  SSRS also relies on Trauma Nurses, 242 N.J. at 144, where the Court found the nurses were independent contractors of a nursing agency because the nurses could work as much or as little as they wanted and were free to work elsewhere.

---

[9]  CCRA advances similar arguments regarding the ABC test.

SSRS argues it satisfied prong B because reporters' services are performed at law firms, court buildings, meeting halls, and business offices. SSRS contends it is clear the reporters' services are performed outside of SSRS's business enterprise. Further, SSRS has no control over the places where the services are performed.

Regarding prong C, SSRS contends the individuals working as reporters do so in an independently established trade. Multiple reporters testified if a court reporting agency went out of business, the reporter could obtain work at another agency. SSRS cites East Bay for the proposition that "[t]he thrust of prong C broadly asks whether a worker can maintain a business independent of and apart from the employer." 251 N.J. at 496. Here, SSRS argues the reporters are not dependent on their agency for finding work and are able to switch agencies when one closes or a relationship otherwise terminates.

SSRS also argues they have established a FUTA exemption for the audit period of 2006-2008. They state prior to 2010, court reporters were exempt from unemployment tax if: (1) there was a FUTA exemption or (2) the individuals satisfied the ABC test for independent contractors. SSRS argues it had a FUTA exemption at the time of the first audit. It asserts evidence of a FUTA exemption included "[d]ocumentation of responses to the [twenty-point] test[] required by the [IRS] to meet its criteria for independence." In 2018, the Administrative

Code was amended to eliminate the IRS test for independence, but the IRS test was still in effect during SSRS's audits, so it argues it should be able to use the test. SSRS argues it would satisfy the IRS test.

Lastly, SSRS contends that if the court reporters are determined to be employees, the assessments must be recalculated because there were multiple delays and stays in the matter over the course of several years, purportedly through no fault of their own.[10] SSRS argues it would be unjust to assess any interest or penalties against it for the periods of inaction during the proceedings.

C.

The scope of our review is narrow. Appellate courts review decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." East Bay, 251 N.J. at 493 (citing Hargrove, 220 N.J. at 301-02). That enhanced deference stems, in part, from "the executive function of administrative agencies." Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the

---

[10] The delays included: writing to the IRS; appealing and waiting for a hearing at the OAL; investigation of a fraudulent letter sent to the IRS; placement of the case on the inactive list with the OAL three times; and the COVID-19 pandemic delaying the Commissioner's final decision by twenty-two months.

record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). The reviewing court "does not substitute its judgment of the facts for that of an administrative agency." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001) (citation omitted). Rather, the reviewing court "defer[s] to matters that lie within the special competence" of the administrative agency. Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 202 (App. Div. 2003). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

On appeal, the judicial role in reviewing an administrative action is generally limited to three inquires:

> (1)　whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2)　whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3)　whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto Grp., 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007).[11]

The statutory framework at issue in this appeal, the UCL, N.J.S.A. 43:21-1 to -71, "was designed to act as a cushion 'against the shocks and rigors of unemployment.'" East Bay, 251 N.J. at 494 (quoting Carpet Remnant, 125 N.J. at 581). Whether a putative employer is required to pay into an unemployment benefits fund under N.J.S.A. 43:21-7, turns on whether its workers are employees or independent contractors. Id. at 484-85. Importantly, "[b]ecause the statute is remedial, its provisions have been construed liberally, permitting a statutory employer-employee relationship to be found even though that relationship may not satisfy common-law principles [of employment]." Id. at 494 (second alteration in original) (quoting Carpet Remnant, 125 N.J. at 581).

---

[11] Furthermore, "where there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 583 (App Div. 2014) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)). "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Id. at 584 (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)).

The UCL sets forth the ABC test for making that determination.[12]  Id. at 485; N.J.S.A. 43:21-19(i)(6)(A) to (C).  Any service performed for renumeration

---

[12] We limit our discussion to the ABC test in this matter.  In the JSR matter, the ALJ also applied the IRS twenty-point test and the new IRS three-factor test.  The DOL repealed N.J.A.C. 12:16-23.2(a)(4) which previously allowed the use of the IRS twenty-point test. N.J.A.C. 12:16-23.2(a) (2018).  The DOL determined its prior use of the IRS's tests for independence put it in an "extremely difficult, if not untenable, position of having to ascertain, without the benefit of a determination from the IRS" whether its test was met for particular services.  50 N.J.R. 2012(a) (Sept. 17, 2018).  We agree the purpose of the adoption was for the DOL to stop conducting its own analysis of the IRS tests to determine if there was a FUTA exemption and required more definitive findings from the IRS as set forth in N.J.A.C. 12:16-23.2.

Moreover, under the "time of decision" rule, the Commissioner declined to apply the IRS test and found the ALJ erred when he applied it.  The time of decision rule applies not only to statutes passed by the Legislature, but also to regulations enacted by administrative agencies.  In such administrative law contexts, a court will routinely apply a government agency's rules and regulations as they exist at the time that the case or appeal is decided.  See, e.g., In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 333 (App. Div. 2002); Walker v. N.J. Dep't of Insts. & Agencies, 147 N.J. Super. 485, 489 (App. Div. 1977).

We agree with the Commissioner the time of decision rule applies, and thus we also do not address the IRS tests for independence as to JSR or SSRS.  Consequently, because JSR did not present any of the three remaining forms of proof (private letter ruling from the IRS, an IRS audit, or an IRS determination letter) accepted under N.J.A.C. 12:16-23.2(a) to establish a FUTA exemption, the Commissioner properly found there was no FUTA exemption.  Moreover, the non-binding IRS letter obtained by SSRS was not a determination letter under N.J.A.C. 12:16-23.2(a), and therefore did not prove that SSRS had a FUTA exemption.

A-1500-21

under any express or implied contract is presumed to be employment unless the ABC test is satisfied.  East Bay, 251 N.J. at 495.  The statutory test reads:

> Services performed by an individual for renumeration shall be deemed to be employment . . . unless and until it is shown to the satisfaction of the [DOL] that:
>
> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact;
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.
>
> [N.J.S.A. 43:21-19(i)(6).]

Because the statutory ABC test is formulated in the conjunctive and presumes that services for renumeration constitute employment, the party challenging the DOL's determination of an employer-employee relationship has the burden of "establish[ing] the existence of all three criteria."  East Bay, 251 N.J. at 495 (quoting Carpet Remnant, 125 N.J. at 581) (emphasis added).  The ABC test "is fact-sensitive, requiring an evaluation in each case of the substance, not the form, of the relationship."  Id. at 496 (quoting Carpet Remnant, 125 N.J.

at 581).  "The factfinder must look beyond the employment contract and the payment method to determine the true nature of the relationship."  Ibid.

Because we conclude below the Commissioner did not act in an arbitrary or capricious manner in finding JSR and SSRS failed to satisfy prong C, we defer to the agency decision.  Moreover, we confine our analysis to that prong, and we need not address prongs A and B.[13]  See id. at 495 (citing Carpet Remnant, 125 N.J. at 581 (the ABC test is formulated in the conjunctive requiring the worker to prove all three criteria)).

Prong C relies on whether the reporters are "customarily engaged in an independently established trade, occupation, profession or business."  N.J.S.A. 43:21-19(i)(6)(C).  The Court in East Bay noted, "[p]rong C 'provides the closest connection between the obligation to pay taxes and the eligibility for benefits.'"  251 N.J. at 496 (quoting Carpet Remnant, 125 N.J. at 589).  "[T]he [prong] C standard is satisfied when a person has a business, trade, occupation, or profession that will clearly continue despite termination of the challenged relationship."  Id. at 497 (second alteration in original) (quoting Carpet Remnant, 125 N.J. at 586).  Importantly, "[t]he present tense of the verb, 'is' [as used in the statute], indicates that the employee must be engaged in such

_____

[13]  We do not intimate any views on whether the Commissioner's analysis of prongs A and B was arbitrary or capricious.

independently established activity at the time of rendering the service involved." Gilchrist v. Div. of Emp. Sec., 48 N.J. Super 147, 158 (App. Div. 1957).  Stated another way, "[i]f the worker 'would join the ranks of the unemployed' when the relationship ends, the worker cannot be considered independent under prong C." East Bay, 251 N.J. at 497 (quoting Carpet Remnant, 125 N.J. at 585-86).

A non-exhaustive list of the relevant factors to consider under prong C includes:  "the duration and strength of the [worker]s' businesses, the number of customers and their respective volume of business, the number of employees, and the extent of the [worker]s' tools, equipment, vehicles, and similar resources."  Carpet Remnant, 125 N.J. at 593.  Moreover, the amount of renumeration received from the putative employer compared to other sources is also an important consideration.  Ibid.  Notably, our Supreme Court has acknowledged that "even wholly dependent employees may choose to work for more than one employer . . . ."  East Bay, 251 N.J. at 498.

The Commissioner determined JSR and SSRS offered insufficient evidence to satisfy prong C and rebut the presumption the reporters were employees, rather than engaged in "a profession that will plainly persist despite the termination of the challenged relationship."  Hargrove, 220 N.J. at 306. Additionally, the records cited by the Commissioner regarding the court reporters supported his conclusion the court reporters were not customarily

engaged in an independently established business. Moreover, with respect to JSR, the record supported the Commissioner's finding that many of the reporters derived all or most of their renumeration from JSR.

It was JSR's and SSRS's burden to prove prong C. However, JSR only provided information on less than half of its reporters. SSRS likewise provided very limited information. Moreover, SSRS conceded it "does not know how often court reporters are working for other agencies." In this regard, the Trauma Nurses Court's analysis under prong C is distinguishable because there is no indication that broker failed to provide the Commissioner sufficient information to evaluate prong C. Rather, the Court noted those nurses did not work exclusively through the agency and demonstrated they worked "simultaneously for other brokers, hospitals and health care institutions." Trauma Nurses, 242 N.J. at 148. Here the Commissioner was not satisfied petitioners established the reporters were "customarily engaged" in an independent trade at the time of the audits while rendering services for petitioners due to the insufficient proofs provided. See Gilchrist, 48 N.J. Super at 158.

Although JSR argued that the reporters could find work with another agency if it were to go out of business, the Commissioner rejected this argument based on the proofs submitted and principles noted above. Despite requests for information, JSR and SSRS did not provide the DOL sufficient evidence to

demonstrate the independence of the reporters. Accordingly, the DOL and the Commissioner presumed the reporters were employees, as petitioners failed to rebut the presumption under N.J.S.A. 43:21-19(i)(6).

The Commissioner noted the reporters' work, despite arguments otherwise, will not plainly persist because they were never independent in the first place. Our role is not to substitute our judgment for that of the Commissioner. Campbell, 169 N.J. at 587. Rather, we must determine whether the Commissioner's decision was arbitrary or capricious. In light of petitioners' burden of proof, there was ample evidence in the record to support the Commissioner's conclusion as to prong C. Accordingly, petitioners are responsible for those assessments imposed by the Commissioner that pre-date the adoption of N.J.S.A. 43:21-19(i)(10). To the extent we have not addressed them, any remaining arguments raised by the parties lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Reversed in part, affirmed in part, and remanded for the Commissioner to recalculate the amount owed by petitioners consistent with this opinion.[14] We do not retain jurisdiction.

---

[14] SSRS asserts it was unfairly assessed certain costs during the lengthy time period this case was inactive through no fault of its own. The DOL argues there is nothing in the record to suggest any assessments were attributed to the delays in adjudicating this matter. Because we are remanding for the assessment to be

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

recalculated consistent with this opinion, to the extent any interest or penalties were assessed against either petitioner due to delays not caused by them, the Commissioner shall adjust its final assessment accordingly.

A-1500-21